THE CITY OF CHICAGO, Plaintiff-Appellant, v. MICHIGAN BEACH
HOUSING COOPERATIVE *et al.*, Defendants-Appellees.

First District (2nd Division)   Nos. 1—92—1496, 1—92—1734 cons.

Opinion filed January 26, 1993.

Kelly R. Welsh, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, Mardell Nereim, and Joan Boman, Assistant Corporation Counsel, of counsel), for appellant.

Torshen, Schoenfeld & Spreyer, Ltd. (Jerome H. Torshen, of counsel), and Canel, Davis & King (Jay A. Canel, of counsel), both of Chicago, for appellees Jayson Investments, Inc., Michigan Beach Limited Partnership, Michigan Beach Development Corporation, Braden-Jayson Construction, Inc., and Michigan Beach Housing Cooperative.

McDermott, Will & Emery, of Chicago (Alan S. Rutkoff and Scott W. Ammarell, of counsel), for appellees National Tax Credit Investors II, National Tax Credit, Inc. II, and National Partnership Investments Corporation.

Fred Foreman, United States Attorney, of Chicago (Linda A. Wawzenski and Nancy K. Needles, Assistant United States Attorneys, of counsel), for appellee Government National Mortgage Association.

Jones, Day, Reavis & Pogue, of Chicago (James R. Daly and Carol A. Tiesi, of counsel), for appellee Huntoon Paige Associates, Ltd.

John K. Kallman, of Chicago, for appellees Metropolitan Community Foundation, Inc., Sound, Inc., Zera Construction Co., Inc., Jamerson & Bauwens Electrical Contractors, Inc., Midwest Construction and Development Corporation, Northern Trust Corporation, Title Services, Inc., Levenfeld, Eisenberg, Janger, Glassberg, Samotny & Halper, Gremley & Biedermann, Inc., Klayman & Korman, Elliott Dudnik & Associates, and R. Carter Sanders, Jr.

JUSTICE SCARIANO delivered the opinion of the court:

The Michigan Beach Apartments (the building) is comprised of 240 units, all of which were rented to low-income families after the building was erected in 1967. It was financed by a federally insured mortgage upon which the building was in default from 1971 until 1984, when the United States Department of Housing and Urban Development (HUD), its sole creditor, finally foreclosed on the obligation. The owner thereupon declared bankruptcy.

In 1986, defendant Jayson Investments, Inc. (Jayson), whose only two shareholders are Jay Canel and Scott Canel (the developers), presented to the bankruptcy court a plan of reorganization which prom-

ised to restructure the building as a cooperative, and to which HUD agreed.

Pursuant to the reorganization plan, the developers created defendant Michigan Beach Housing Cooperative (Cooperative), a not-for-profit corporation without assets, which served as the entity through which the developers obtained title to the building from HUD, and through which the residents of the building would manage it. The plan further obligated the developers to hire defendant ICF Development Corporation (ICF) to sell the cooperative units, and the bankruptcy court required that 50% to 70% of them be sold before the plan was to take effect.

In addition to the developers' sponsorship, the Cooperative obtained two loans. The first was a HUD co-insured $6.4 million first mortgage loan from defendant Cincinnati Mortgage Company (CMC). CMC eventually defaulted on its obligations under the co-insurance program and turned over its portfolio of loans, including the Cooperative loan, to defendant GNMA, which became the senior mortgagee. GNMA later hired defendant Huntoon Paige Associates, Ltd. (Huntoon), to service the Cooperative loan.

The second loan acquired by the Cooperative was from plaintiff, City of Chicago (the city), in an amount of approximately $3.3 million; in exchange, the Cooperative granted it a security interest in the building and other related assets. The city's mortgage explicitly stated that it was junior to CMC's and that all payments due under the note secured by the city's mortgage were to be made only from "surplus cash" as defined in the senior mortgage. The city's mortgage also provided that if the Cooperative failed to make its payments on the note, the city could not institute foreclosure proceedings against the building without the consent of the senior mortgagee. The city recorded its mortgage and filed a financing statement with the Illinois Secretary of State.

In April 1989 the developers learned that despite ICF's assurances to the contrary, less than 20% of the building's units had been sold prior to closing and that, consequently, the Cooperative was not optimistic about its ability to make future loan payments. The developers thus proposed to the city and to HUD a new plan, one that would involve the Cooperative's transferring the building to a new limited partnership which would operate the building as a rental complex as opposed to a cooperative. The developers also requested that the city, as well as the State of Illinois, grant the yet-to-be-formed limited partnership low-income housing tax credits so that the inter-

ests in the limited partnership could be sold to a syndicator who would in turn sell interests in the partnership to investors.[1]

Throughout 1989 and 1990, the developers negotiated with the city and HUD. The city committed $300,000 worth of income tax credits to the building in June of 1989; subsequently, the developers also obtained $480,000 worth of tax credits from the Illinois Housing Development Authority.

In early 1991, the developers and HUD agreed to a plan that would restructure the ownership of the building as a limited partnership. The city, in a letter dated February 14, 1991, informed the developers and HUD that it rejected the new plan; apparently, the city wanted to maintain the building as a cooperative instead of an apartment complex. Nevertheless, the restructuring plan was completed and executed at a closing, which the city did not attend, on June 12, 1991. The developers, who had earlier repurchased the building from the Cooperative,[2] transferred it and its related assets to a newly created entity, defendant Michigan Beach Limited Partnership (the limited partnership). The limited partnership's general partners consisted of defendant Michigan Beach Development Corporation (of which the developers were the sole shareholders) and National Tax Credit Inc. II. The major limited partner was the syndicator, defendant National Tax Credit Investors II, a limited partnership with National Tax Credit Inc. II as its general partner (NTC defendants). The NTC defendants, which had given the limited partnership a promissory note for $3,975,000 in January 1991, paid it $2,925,129 toward the balance thereon at the closing, and the limited partnership, pursuant to its agreement with HUD, paid $1,065,600 on the mortgage held by GNMA. In exchange, HUD agreed: (1) not to consent to any attempt by the city to institute foreclosure proceedings; and (2) to allow the

---

[1] The tax credits at issue derive from Congress' Tax Reform Act of 1986 (Pub. L. No. 99—514 approved Oct. 22, 1986). Each year, State and local agencies are granted low-income housing tax credits by the Federal government. The local entities then award the tax credits to eligible low-income properties. Once awarded, the low-income housing tax credits cannot be transferred from the property to which they were awarded—if they are not used because the property does not become a low-income residence, the Federal government reclaims them. Once tax credits are allocated to a property, the owner can sell limited partnership interests in the property so that investors can take advantage of the tax credits. This is called syndication. See generally I.R.C. §42 (1990 & West Supp. 1991); Treas. Reg. §1.42 (1990).

[2] The developers, through Jayson, repaid each unit owner the entire amount of his or her investment along with interest; the total repurchase price was approximately $300,000.

limited partnership to remit the remaining syndication funds to creditors as it wished. Accordingly, the limited partnership used the remainder of the syndication funds to pay off accrued debts to certain unsecured creditors (recipient defendants).

On June 19, 1991, the city, unaware that the closing had already taken place, filed a complaint in the circuit court of Cook County against the Cooperative, the limited partnership and CMC, asserting its rights under its mortgage. The city also sought a temporary restraining order to prevent disbursement of syndication funds to the recipient defendants. After the city learned that the syndication had occurred and the funds had been disbursed, it filed a motion for emergency discovery. GNMA, which was not yet a party to the action, but without anyone objecting to the propriety thereof, removed the suit to Federal court, which granted the city's renewed motion for emergency discovery.

On July 15, 1991, the city filed its first amended complaint against the Cooperative, the limited partnership, CMC, the recipient defendants, the NTC defendants and GNMA. Count I alleges that the city is entitled to recover, under article 9 of the Uniform Commercial Code (Ill. Rev. Stat. 1991, ch. 26, par. 9—101 *et seq.*) (Article 9), its collateral, namely, the note and the cash already and yet to be paid to the recipient defendants (syndication funds). Count II is a conversion action in which the city seeks to recover the note given by the NTC defendants to the limited partnership on the theory that it is the city's collateral. Count III is a replevin action against the recipient defendants and alleges that the city is entitled to replevy its collateral, the cash paid on the note, from them. Count IV alleges that the city is entitled to accelerate repayment of its loan because its mortgage is in default. Count V is a claim to recover the syndication funds disbursed to the recipient defendants on the ground that, since the city's mortgage is in default, they properly belong to the city as "surplus cash." Count VI is a fraud claim based on the misrepresentations of defendants Ida Fisher, ICF, the Cooperative, and Jayson concerning the requirement that 51% of the Cooperative units be sold. Count VII is a contract claim based on alleged broken commitments to the city regarding certain Federal regulations on the use of loan funds.[3]

The city filed a motion for summary judgment on counts I and II and a motion for a preliminary injunction seeking to require the recip-

---

[3]This appeal concerns only counts I through V of the complaint; counts VI and VII are still pending in the trial court.

ient defendants to place the syndication proceeds in an escrow account. While these matters were under advisement, the Federal district court on January 10, 1992, granted the NTC defendants' motion to remand the cause to the circuit court.

On February 18, 1992, Judge Lester Foreman granted the city's motion for a temporary restraining order to prevent the limited partnership from disbursing any more syndication funds. On April 8, 1992, Judge Albert Green heard and denied the city's motions for summary judgment and for a preliminary injunction as well as its motion to stay dissolution of the temporary restraining order pending appeal. On April, 30, 1992, the city filed a notice of interlocutory appeal pursuant to Supreme Court Rule 307(a)(1). 134 Ill. 2d R. 307(a)(1).

On May 8, 1992, Judge Green granted the NTC defendants' and the limited partners' joint motion to dismiss counts I through V of the city's complaint pursuant to section 2—615 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—615), based on his denial of the city's motion for a preliminary injunction. The court also made a Rule 304(a) finding that there was no just reason to delay the enforcement or appeal of its dismissal of counts I through V; and on May 13, 1992, the city filed its notice of appeal from that order pursuant to Supreme Court Rule 304(a). 134 Ill. 2d R. 304(a).

I

As a preliminary matter we must consider whether we have jurisdiction of these appeals under Illinois Supreme Court Rules 304(a) (134 Ill. 2d R. 304(a)) and 307(a)(1) (134 Ill. 2d R. 307(a)(1)). The NTC defendants challenge our jurisdiction over the appeal of the trial court's dismissal of counts I through V of the complaint under Rule 304(a) because, they allege, the dismissal was pursuant to an agreed order and thus not a proper basis for a Rule 304(a) appeal. (See *Kandalepas v. Economou* (1989), 191 Ill. App. 3d 51, 53, 547 N.E.2d 496, 498.) The NTC defendants further argue that this court does not have jurisdiction over the interlocutory appeal pursuant to Rule 307(a)(1) because no preliminary relief was ever requested against them in the trial court. See *Bell v. Yale Development Co.* (1981), 102 Ill. App. 3d 108, 112, 429 N.E.2d 894, 897.

Under Supreme Court Rule 304(a) an appeal may be taken from a final judgment as to one or more but less than all of the claims in an action if the trial court makes an express finding that there is no just reason to delay enforcement or appeal of the judgment. (134 Ill. 2d R. 304(a).) We must, therefore, determine whether the trial court's order dismissing counts I through V of the city's complaint was, in fact, fi-

nal and appealable. *Viirre v. Zayre Stores, Inc.* (1991), 212 Ill. App. 3d 505, 511-12, 571 N.E.2d 209, 213.

■ The NTC defendants' claim that the trial court's dismissal was based on an agreed order, and thus not final, is groundless. The record clearly establishes that the trial court's decision to dismiss counts I through V of the complaint was based on its earlier denial of the city's motion for a preliminary injunction for the reason that the city could not establish any probability of success on the merits. The "agreement" between the parties, made in the interests of judicial economy, was simply that the court would rule the same way on the motion to dismiss as it did on the motion for a preliminary injunction. The court concurred in that "agreement" based on its prior ruling, and accordingly entered an order dismissing counts I through V, adding the appropriate Rule 304(a) certification language. We therefore have jurisdiction over the trial court's section 2—615 dismissal of counts I through V under Supreme Court Rule 304(a).

■ The NTC defendants' claim that the city did not seek injunctive relief against it is also without warrant. Supreme Court Rule 307(a)(1) grants the appellate court jurisdiction over interlocutory appeals "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction." (134 Ill. 2d R. 307(a)(1).) The record clearly establishes that the city requested that its injunction bind the NTC defendants as well as all others. Accordingly, we clearly have jurisdiction over the trial court's denial and dismissal of the city's request for injunctive relief.

## II

When ruling on a motion to dismiss under section 2—615 (Ill. Rev. Stat. 1991, ch. 110, par. 2—615), the trial court should grant such a motion with prejudice only when it is apparent that the plaintiff cannot allege any set of facts that would permit recovery. (*Burdinie v. Village of Glendale Heights* (1990), 139 Ill. 2d 501, 504-05, 565 N.E.2d 654, 657.) On appeal, this court must accept, as was the obligation of the circuit court, all well-pleaded facts as true and draw therefrom all reasonable inferences which are favorable to the moving party. (*Burdinie*, 139 Ill. 2d at 504-05, 565 N.E.2d at 657; *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.* (1991), 218 Ill. App. 3d 383, 389, 577 N.E.2d 1344, 1355.) The reviewing court should affirm the trial court's dismissal if it determines that the complaint, so viewed, does not state a claim upon which a relief may be granted. *Burdinie*, 139 Ill. 2d at 505, 565 N.E.2d at 657.

Counts I through III of the city's claim are all based on the theory that the syndication funds (the note and/or the cash) are its collateral or, in the alternative, are the cash proceeds of the income tax credits which are collateral covered by the security agreement as represented by the city's mortgage. The court below disagreed.

■■ Article 9 simply defines "collateral" as "property subject to a security interest" (Ill. Rev. Stat. 1991, ch. 26, par. 9—105(c)); and a security interest is limited to the property described in the security agreement. (*Allis-Chalmers Corp. v. Staggs* (1983), 117 Ill. App. 3d 428, 432, 453 N.E.2d 145, 148.) The determination of whether a creditor's security interest encompasses property acquired after the date of the security agreement is governed by the intent of the parties as expressed in the agreement. *In re Nightway Transportation Co.* (N.D. Ill. 1989), 96 Bankr. 854, 858.

■■ Section 9—110 of the Uniform Commercial Code states that "[f]or the purposes of this Article any description of personal property or real estate is sufficient whether or not it is specific if it *reasonably identifies* what is described." (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 26, par. 9—110.) In *Midkiff Implement Co. v. Worrall* (1983), 116 Ill. App. 3d 546, 451 N.E.2d 623, the court, in endorsing the proposition that section 9—110 allows for a broad description of collateral in a security agreement, cited favorably the following Illinois Code Comment to that section:

> "The test is whether the description 'reasonably identifies what is described,' which it will do if it describes the property so as to distinguish it from any other property with which it might be confused." *Midkiff*, 116 Ill. App. 3d at 549, 451 N.E.2d at 625, quoting Ill. Ann. Stat., ch. 26, par. 9—110, Illinois Code Comment, at 85 (Smith-Hurd 1974).

■■ In arguing that its security interest covers the syndication funds, the city points to clause (D) of its security agreement, which states that it has a continuing security interest in all "income, rents, issues, proceeds and profits accruing, and to accrue, from the Real Estate and Improvements." Applying the "reasonable identification" test, we find that clause (D) does not reasonably identify the syndication funds received by the limited partnership. Those funds were obtained by the limited partnership from the sale of interests in the limited partnership to the syndicator (NTC defendants), which in turn sold such interests to investors, and under no sensible interpretation of clause (D) can this influx of capital into the limited partnership be "reasonably identified" as "income, rents, issues, proceeds [or] profits accruing *from the Real Estate*" (emphasis added). The only nexus be-

tween the real estate and the transaction under discussion is that the limited partnership owns the real estate. Quite simply, the real estate was not sold to the syndicator; thus, the funds could not have accrued from that source. Moreover, title to the realty itself remains unaffected, and the city's security interest and its rank vis-a-vis other security interests in it remain unchanged. The city's claim that its security interest "reaches every type of interest of any value to the mortgagor" is plainly incorrect. Had that been its intent, the city could have said so with the same facility with which it now expresses it; but we are not to be understood as implying that the use of such language would have produced a result any different than the one we reach today. Accordingly, we hold that the syndication funds received by the limited partnership and distributed to the recipient defendants do not constitute collateral for the city's loan.

The city alternatively maintains that the syndication funds are "proceeds" of its collateral which the limited partnership sold, the collateral being the income tax credits. The trial court rejected this argument, finding that the syndication funds were not "identifiable proceeds" of any of the city's collateral.

■ Generally, under sections 9—306(2) and (3) of Article 9, as long as the creditor has a perfected security interest in the underlying collateral, he will also have a perfected security interest in the identifiable proceeds of the sale of the collateral, even if the term "proceeds" is absent from the security agreement or the financing statement. Ill. Rev. Stat. 1991, ch. 26, pars. 9—306(2), (3); In re Keneco Financial Group, Inc. (N.D. Ill. 1991), 131 Bankr. 90, 94; Farns Associates, Inc. v. South Side Bank (1981), 93 Ill. App. 3d 766, 769-70, 417 N.E.2d 818, 821.

The city argues that the income tax credits are covered by clause (E) of its security agreement, which states that the city has a security interest in "all *** interests *** in and to all *** personal property of any kind or character now or hereafter owned by Borrower and *** used or useful in connection with the Real Estate and Improvements." The city maintains that the tax credits are a general intangible personal property interest "used in connection" with the building that qualifies as a type of collateral under Article 9. Therefore, the city reasons, the syndication funds (the note and the cash) are "proceeds" of its collateral (the tax credits).

■ We agree with the trial court and hold that the city's security agreement does not cover the income tax credits; we find them at best to be only remotely as well as indirectly "connected" to the building in the sense that only the entity which owns the building can

use the tax credits to attract potential investors, a fire too distant to give any warmth to the city. We find, instead, the phrase "used or useful in connection with the real estate" to be indisputably confined to the narrower interpretation which limits the security interest to property that has some physical connection to the building. This becomes especially clear when we consider that clause (G) of the security agreement refers to property "related to the Real Estate," as opposed to property "connected to" it. The tax credits are not covered by clause (G) either, because it does not contain an after-acquired property clause, and the limited partnership unquestionably acquired the tax credits after the agreement was signed. Consequently, we hold that the city's security agreement does not implicate the tax credits awarded to the limited partnership.

We find the city's argument unavailing also because income tax credits cannot be intangible personal property subject to a security interest under Article 9. General intangibles are defined in Article 9 as "any *personal property* *** other than goods, accounts, chattel paper, documents, instruments, and money." (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 26, par. 9—106.) Although no court has yet determined whether income tax credits constitute general intangibles for purposes of Article 9, the United States Supreme Court addressed their nature in *Randall v. Loftsgaarden* (1986), 478 U.S. 647, 92 L. Ed. 2d 525, 106 S. Ct. 3143, and considered whether they were income for purposes of section 12(2) of the Securities Act of 1933 (15 U.S.C. §77a *et seq.*). In doing so, the court stated:

> "The tax benefits attributable to ownership of a security initially take the form of tax deduction credits. These have no value in themselves; the economic benefit to the investor—the true 'tax benefit'—arises because the investor may offset tax deductions *against* income received from other sources or use tax credits to reduce the taxes otherwise payable on account of such income. Unlike payments in cash or property received by virtue of ownership of a security—such as distributions or dividends on stock, interest on bonds, or a limited partner's distributed share of the partnership's capital gains or profits—the 'receipt' of tax deductions or credits is not itself a taxable event, for the investor has received no money or other 'income' within the meaning of the Internal Revenue Code.
>
> * * *
>
> *** Respondents essentially ask us to treat tax benefits as a separate asset that is acquired when a limited partner purchases a share in a tax shelter partnership. But the legal form

of the transaction does not reflect this treatment. Petitioners purchased securities, thereby acquiring freely alienable rights to any income that accrued to them by virtue of their ownership. They did not, however, also acquire a separate, freely transferable bundle of tax losses that would have value apart from petitioners' status as partners. For obvious reasons, tax deductions and tax credits are not, in the absence of a statutory provision to the contrary, freely transferable from one person to another if wholly severed from the property or activity to which they relate ***. [Citation.] Accordingly, *we decline to treat these tax losses as so much property created by the promoters of the partnership.*" (Emphasis added.) *Randall*, 478 U.S. at 656-57, 665-66, 92 L. Ed. 2d at 537, 543, 106 S. Ct. at 3149, 3154.

Although *Randall* was decided in the context of securities regulation, subsequent cases have held that its analysis of tax credits should apply as well beyond the interpretation of securities laws. *Bove v. Worlco Data Systems* (E.D. Pa. Jan, 21, 1987), No. 86—1419, slip op. at 2; accord *Federal Deposit Insurance Corp. v. W H Venture* (E.D. Pa. June 1, 1987), No. 84—5673, slip op. at 5.

Applying the Supreme Court's analysis in *Randall* to the case at bar, we are led ineluctably to the conclusion that the tax credits at issue cannot serve as collateral because they are not general intangible personal property. Tax credits, as *Randall* instructs us, have no independent value in and of themselves; instead, they are an incidental benefit that investors receive when they purchase a security evidencing their interest in a limited partnership. The investors cannot transfer or sell the tax credits separate from the security itself. The limited partnership did not "sell" the tax credits to the investors; the tax credits remain exactly where they resided before the sale of the securities, in the limited partnership. Accordingly, it is clear that the NTC defendants in this case did not purchase and do not own tax credits; instead, they bought and now possess securities which gave them an interest in the Michigan Beach Limited Partnership. The tax credits they received along with their interest in the partnership were incidental benefits of that investment—not separate intangible personal property which could collateralize the city's loan—and whatever benefit they conferred on the investor renders no comfort to the city.

The cases that the city cites in an attempt to refute the application of *Randall* do not parse. First, in *Rankin Properties, Ltd. v. Woodhollow Estates* (S.D. Miss. 1989), 714 F. Supp. 800, 802, the defendant granted Rankin a security interest in all of its partnership

interest, including the expected profit from that investment. The court did not reach the issue of whether the tax benefits were part of that security interest. (See *Rankin*, 714 F. Supp. at 802 ("Rankin has admitted that it does hold a UCC security interest in Woodhollow's rights in their limited partnership").) The other cases cited by the defendant stand for the now well-settled proposition that current or expected income tax refunds are general intangible property interests under Article 9. (See, *e.g., In re Palmetto Pump & Irrigation, Inc.* (M.D. Fla. 1987), 81 Bankr. 109, 111-12; *In re Tele/Resources* (S.D.N.Y. 1982), 21 Bankr. 358, 362-63; *In re Kendrick & King Lumber, Inc.* (W.D. Okla. 1981), 14 Bankr. 764, 766.) Surely, however, tax *refunds* are vastly different than tax *credits* as defined by *Randall*. Income tax refunds are quite obviously a property right because they constitute a present or future right to receive money which can be freely transferred after receipt. We reiterate, at the risk of appearing to be didactic, that unlike income tax refunds, tax credits do not constitute a right to a payment of money, have no independent value, and are not freely transferable upon receipt.

In sum, we hold that the city does not have a security interest in the syndication funds; we therefore conclude that the trial court properly dismissed counts I through III of the city's complaint.

### III

Counts IV and V of the city's complaint allege that its mortgage is now in default under section 3.01 of the mortgage[4] because the Co-operative refinanced the loan, resyndicated the project, and transferred the building and related assets to the limited partnership. The city further contends that although it is prohibited from foreclosing on the mortgage without the senior lender's consent if it fails to receive payments on its note, that provision does not preclude it from recovering its collateral (the syndication funds) when its loan is refinanced or when the building is transferred. The trial court rejected this argument, holding that the city waived its right to enforce the default pro-

---

[4]Section 3.01 of the city's mortgage provides:

"*Events of Default*:

The terms 'Event of Default' or 'Events of Default,' wherever used in this Mortgage, shall mean any one or more of the following events

\* \* \*

(e) The sale, partial sale, refinancing, or resyndication or other disposition of all or part of the Premises, except as expressly permitted under the Note or this Mortgage."

vision in question, and even if did not waive it, none of the actions taken by the developers resulted in a default under that provision.

We find the city's position baseless. First, even if the city had a right to declare a default because the developers resyndicated the project and transferred the building to the limited partnership, it has no right, as discussed above, to the syndication funds because they do not constitute the city's collateral.

Second, we agree with the trial court and hold that the city waived its right to enforce the default provision when it granted the Cooperative tax credits with knowledge that the Cooperative was going to transfer the building to another entity which would use those credits.

■ Waiver is a voluntary relinquishment of a known right, claim or privilege. (*Vaughn v. Speaker* (1988), 126 Ill. 2d 150, 161, 533 N.E.2d 885, 890.) Waiver may be made by an express agreement or it may be implied from conduct inconsistent with an intent to enforce the right by the party who is alleged to have waived that right. (*Ryder v. Bank of Hickory Hills* (1991), 146 Ill. 2d 98, 105, 585 N.E.2d 46, 49; *Wald v. Chicago Shippers Association* (1988), 175 Ill. App. 3d 607, 621, 529 N.E.2d 1138, 1147.) Implied waiver requires that an intention to waive be clearly inferred from the circumstances and that the waiving party make a "clear, unequivocal and decisive act." (*Ryder*, 146 Ill. 2d at 105, 585 N.E.2d at 49; *Kelly v. Economy Fire & Casualty Co.* (1990), 196 Ill. App. 3d 337, 341, 553 N.E.2d 412, 414, *appeal denied* (1990), 132 Ill. 2d 546, 555 N.E.2d 377.) While the question of whether a party has waived its right to accelerate payments under a promissory note is generally one of fact (*Ryder*, 146 Ill. 2d at 105, 585 N.E.2d at 49), where there is no dispute as to the material facts and only one reasonable inference can be drawn therefrom, the question of whether those facts constitute waiver is one of law. (*Wald*, 175 Ill. App. 3d at 621, 529 N.E.2d at 1147-48.) Finally, whether waiver has occurred depends on the circumstances of each particular case. *Kelly*, 196 Ill. App. 3d at 340, 553 N.E.2d at 412.

■ We hold as a matter of law that the facts in the instant case indicate that the city impliedly waived its right to declare default upon the developers' reorganization of the project when it granted them tax credits to the building. The fact that the city granted the developers $300,000 in income tax credits upon their request is undisputed. The city reluctantly concedes that by granting the developers tax credits, it knew that some sort of reorganization, including resyndication, refinancing and transfer of the building to a new entity, was a necessary prerequisite to the developers' use of the credits. The fact

that it later objected to the developers' precise *type* of reorganization does not negate the fact that the city, by granting the tax credits, consented to some sort of a reorganization that would be inconsonant with the default provision (section 3.01(e)) of its mortgage. Consequently, the circuit court was correct in holding that the city waived its right to enforce the default provision in its mortgage.

The city nevertheless argues that even if it did waive its right to declare a default by granting the tax credits, it revived that right through its letter of February 14, 1991, which stated that it was reserving all of its rights. We disagree. It is a hoary principle of Illinois law that once a ground for forfeiture has been waived, it cannot be revived. *Perry v. Waddelow* (E.D. Ill. 1956), 145 F. Supp. 349, 350; *Sheldon v. Dunbar* (1902), 200 Ill. 490, 492-93, 65 N.E. 1095, 1095-96; *Garbaczewski v. Vanucci* (1950), 342 Ill. App. 367, 369, 96 N.E.2d 653, 654; *Elmore Real Estate Improvement Co. v. Olson* (1947), 332 Ill. App. 475, 480, 76 N.E.2d 204, 206; see *Insurance Corp. of Ireland, Ltd. v. Board of Trustees of Southern Illinois University* (7th Cir. 1991), 937 F.2d 331, 337 (under Illinois law, one cannot revive waived right); *Tri-City Jewish Center v. Blass Riddick Chilcote* (1987), 159 Ill. App. 3d 436, 440, 512 N.E.2d 363, 366 ("A waiver once made is irrevocable and cannot be revived"), *appeal denied* (1988), 118 Ill. 2d 552, 520 N.E.2d 393; *Kewanee Production Credit Association v. G. Larson & Sons Farms, Inc.* (1986), 146 Ill. App. 3d 301, 306, 496 N.E.2d 531, 534 ("Having waived a known right, defendant may not now attempt to revoke its waiver and revive its rights").

The city overlooks this rule; instead, it cites cases which stand for an apparent exception to the general rule stated above that a waiver of a "time-of-the-essence clause" may be revived upon a clear intention to do so. (See, *e.g., Hart v. Lyons* (1982), 106 Ill. App. 3d 803, 806, 436 N.E.2d 723, 725; *Margolin v. Franklin* (1971), 132 Ill. App. 2d 527, 531-32, 270 N.E.2d 140, 143; but see *Perry*, 145 F. Supp. at 350 ("The *general rule* applied to contracts is that any ground for forfeiture once waived cannot be revived.") (Emphasis added).) Since the case *sub judice* obviously does not involve a time-of-the-essence clause, the general rule applies; accordingly, the city's letter of February 14 does not resuscitate its right to declare a default under section 3.01 of its mortgage, which right it had previously waived by allocating the tax credits to the building for the developers' use. Consequently, we conclude that the trial court properly dismissed counts IV and V of the city's complaint.

## IV

■■ In addition to contending that the trial court erred in dismissing counts I through V of its complaint, the city maintains also that the court erred by denying its motion for a preliminary injunction to prohibit the defendants from dispersing any more of the syndication funds. In order to obtain preliminary injunctive relief, a plaintiff must establish: (1) the existence of a right or interest which may be legally protected; (2) irreparable injury should the injunction be refused; (3) no adequate remedy at law; (4) a likelihood of success on the merits; and (5) that the benefits of granting injunctive relief outweigh any possible injury to defendants as a result thereof. (*Agrimerica, Inc. v. Mathes* (1988), 170 Ill. App. 3d 1025, 1030-31, 524 N.E.2d 947, 950.) The decision to grant or deny a preliminary injunction is within the trial court's sound discretion, and its findings will not be disturbed unless they are against the manifest weight of the evidence. *Agrimerica*, 170 Ill. App. 3d at 1031, 524 N.E.2d at 950.

The trial court denied the city's motion for a preliminary injunction because it decided that it did not demonstrate a likelihood of success on the merits of its claim. Having held that the trial court was correct in concluding that the city's claims to the syndication funds are unfounded, we hold that the trial court was correct in denying the city's request for preliminary injunctive relief.

For all of the foregoing reasons, we affirm the trial court's dismissal of counts I through V of the city's complaint as well as its denial of the city's motion for preliminary injunctive relief.

Affirmed.

McCORMICK, P.J., and DiVITO, J., concur.