2023 IL App (1st) 220994-U

FIRST DISTRICT,
FIRST DIVISION
December 11, 2023

No. 1-22-0994

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| FLOYD H. ABRAMSON, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 13 CH 17457 |
| | ) | |
| PAUL J. ABRAMSON, | ) | Honorable |
| | ) | Cecelia A. Horan, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    Held:  In action to enforce no-contact clause in settlement agreement, (1) circuit court did not err in retaining jurisdiction over the action; (2) defendant's petition to substitute judge for cause was not timely filed; (3) plaintiff did not waive no-contact provision; and (4) fee award was not an abuse of discretion.

¶ 2    On July 24, 2013, plaintiff Floyd Abramson filed a Complaint for Injunctive and Other Relief against his son Paul Abramson. Count I of the amended complaint alleged a claim for breach of a 2009 settlement agreement, and count II sought preliminary and permanent injunctive relief directing Paul to comply with the settlement agreement.

¶ 3      On Floyd's motion for summary judgment, the trial court held that Paul violated the no-contact provision of the settlement agreement and that Floyd had not waived that provision. The court enjoined Paul from any future breaches of the settlement agreement and awarded Floyd $500,000 in attorney fees to be indemnified by Paul pursuant to the agreement's fee-shifting provision. For the reasons that follow, we affirm.

¶ 4                             BACKGROUND

¶ 5                    The Underlying Probate Proceeding

¶ 6      Jane and Floyd Abramson were married in 1954 and had four children: Anne, Paul, Amy, and Rachel. Starting in 1990, Paul filed multiple lawsuits against various family members, including an action against Floyd for allegedly "falsely imprison[ing]" him at two mental institutions during his childhood "without any valid medical or psychological reason." (The suit was dismissed on statute of limitations grounds.) Paul also filed lawsuits against his sisters and uncle.

¶ 7      Jane died on November 21, 2007. On February 13, 2008, her will, which disinherited Paul, was admitted to probate in the circuit court of Cook County, and Floyd was appointed the independent executor of her estate. *Estate of Jane B. Abramson*, No. 08-P-111335 (Cir. Ct. Cook County). On August 5, 2008, Paul filed a "Petition to Contest Wills and Complaint for Undue Influence and Tortious Interference with Expectancy of Inheritance" (the will contest), naming his sisters and Floyd as respondents.

¶ 8      On June 29 and 30, 2009, the parties engaged in mediation, resulting in the settlement of Paul's will contest. In the settlement agreement, Floyd and Paul's sisters agreed to make a one-time payment of $500,000 to Paul and $500,000 to Paul's counsel. In return, Paul released his family from "any and all" claims arising from "any matter, cause, event or thing whatsoever

from the beginning of the world to the date of this Agreement." The agreement included a no-contact clause providing that "[e]xcept as required by law or through and to counsel, Paul will not, directly or indirectly, by himself or through others, ever contact or communicate with any *** Releasee after the Effective Date" and an indemnification clause, allowing Floyd to pursue attorney fees and costs resulting from Paul's breach of the agreement.

¶ 9    The agreement also contained integration, no-reliance, and no-waiver provisions. The integration provision provided that the settlement agreement was "the entire agreement between the parties." The no-reliance provision stated that each party

"agrees, acknowledges and expressly warrants that no information, statement, promise, representation, warranty, condition, inducement or agreement of any kind, whether oral or written, made by or on behalf of any other Party shall be, or has been, relied upon by him, her or it unless specifically and expressly set forth herein."

The no-waiver provision confirmed that the settlement agreement could only be amended "by a written instrument executed by all Parties. No waiver by any Party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and executed by the Party so waiving."

¶ 10    On June 30, 2009, the probate court entered an agreed order dismissing Paul's will contest with prejudice. The dismissal order provided that "[t]he court hereby retains jurisdiction to enforce the terms of the Settlement Agreement." On December 3, 2009, Floyd was discharged as independent executor of Jane's estate, and the estate was closed.

¶ 11                                The Present Action

¶ 12    On March 15, 2013, Floyd filed a motion in the probate court to enforce the no-contact provision of the settlement agreement. On June 18, 2013, the probate judge declined to act on

Floyd's motion because "the estate was closed, *** [i]t has not been reopened, and I have no jurisdiction to enter any orders with regard to this estate."

¶ 13    On July 24, 2013, Floyd filed a two-count Complaint for Injunctive and Other Relief in the chancery division of the circuit court of Cook County, which he later amended. The amended complaint alleges that Paul committed "at least 20 separate breaches" of the no-contact clause of the settlement agreement, including:

- In July 2009, Paul made three phone calls to Floyd and mailed him a picture of Paul's daughter. Floyd's counsel notified Paul's counsel that these contacts were "neither invited nor welcome" and that Floyd was "insisting on absolute strict compliance" with the no-contact provision.

- In 2012, using the pseudonym Barry Allen, Paul sent a series of emails to Floyd and his sister Anne. Floyd's counsel reiterated to Paul's counsel that none of the releasees wanted "any contact or communication whatsoever" with Paul.

- In 2013, Paul made several additional attempts to contact Floyd, including sending Floyd "a hostile and threatening email" in which he stated he was "willing to accept" the no-contact provision "in consideration for the sum of $2.15 million dollars."

¶ 14    Floyd further alleged that he had "not initiated contact with Paul, in writing or otherwise." In count I, the "Breach of the Settlement Agreement" claim, Floyd alleged that he was entitled to an award of all attorney fees incurred in connection with Paul's breaches. In count II, the "Preliminary and Permanent Injunctive Relief" claim, Floyd requested the entry of an order directing Paul to comply with the no-contact provision and enjoining him from any further violations.

¶ 15      Paul moved to dismiss the complaint, alleging that "the Probate Court has explicitly retained jurisdiction to enforce the Settlement Agreement between the parties." The motion was denied.[1]

¶ 16      The parties filed cross-motions for summary judgment on count I ("Breach of the Settlement Agreement"). Although Paul admitted contacting Floyd on multiple occasions, he argued that Floyd had "unequivocally waived strict adherence to the no-contact clause." In support, he submitted an affidavit averring that at the conclusion of the settlement conference, Floyd had hugged and kissed him and represented that "this was now a family reconciliation and time of joy." He further attested that they dined together after signing the settlement agreement, and Floyd said that he "was looking forward to bringing [Paul] back into the family." Paul initiated a call to Floyd the next day, resulting in a "cordial if short conversation." Floyd later returned a second call from Paul, indicating that "he had been very busy." On July 22, 2009, Paul's attorney advised him that he had received a letter from Floyd's attorney claiming that Paul had violated the no-contact clause of the settlement agreement.

¶ 17      In his summary judgment motion, Floyd argued that Paul had indisputably contacted him and that the "brief contacts" alleged were insufficient as a matter of law to establish that he had intentionally waived his rights under the settlement agreement.

¶ 18      On April 19, 2017, the trial court granted partial summary judgment in favor of Floyd on the breach of the settlement agreement claim. The court found that "Floyd has not expressly waived his right to the No Contact Provision because Floyd has not executed a written instrument expressly waiving his right to enforcement ***. Even if an oral waiver would have

_____

[1] Paul additionally filed a counterclaim for rescission of the settlement agreement. The trial court granted summary judgment to Floyd on the counterclaim, which Paul does not challenge on appeal.

sufficed, Paul has presented no evidence that Floyd orally waived the right to enforce the No Contact Provision." The court also found that

"[t]he three very brief contacts cited by Paul, all of which occurred in a 10-day period immediately following the settlement conference in the Probate case, do not give rise to a claim of waiver or estoppel given the length of the estrangement, Paul's own hostility towards Floyd ***, the nature of Paul's contacts which show that Paul could not have reasonably believed that Floyd would welcome contact of that nature, and the alacrity with which Floyd had his counsel contact Paul's counsel to inform Paul that Floyd was strictly adhering to the No Contact Provision. As Paul has failed to produce any evidence that Floyd either explicitly or implicitly waived the No Contact Provision, he has not proved that a waiver occurred."

¶ 19    On May 23, 2017, Floyd filed a motion for summary judgment on count II (injunctive relief) and to prove up damages on count I, seeking $496,962.12 in attorney fees "plus further Fees paid by Floyd after March 31, 2017." Floyd alleged that Paul "has undertaken a course of conduct deliberately intended to delay the ultimate resolution of the matter *** [and] to needlessly increase the cost of the matter for Floyd," including deliberately evading service for months and filing "frivolous" motions to dismiss, "meritless" counterclaims and affirmative defenses, and multiple motions for substitution of judge. Floyd later supplemented his motion and increased the damages requested to $545,787.49 in fees.

¶ 20    On July 8, 2019, the court entered summary judgment in favor of Floyd and ordered that "[Paul] is enjoined from any future breaches of the Agreement executed by [Floyd] and [Paul], among other parties, on June 30, 2009." On February 20, 2020, the court granted Floyd's motion

to prove up damages, in part, finding that $45,787.49 of Floyd's claimed fees were duplicative and/or excessive, and entered judgment for Floyd and against Paul in the amount of $500,000.

¶ 21                                                    ANALYSIS

¶ 22        On appeal, Paul argues that the trial court erred in (1) "improperly usurp[ing] the jurisdiction of the probate court" by retaining jurisdiction over the action; (2) not referring Paul's motion to substitute judge to another judge; (3) finding that Floyd's conduct toward Paul did not waive the no-contact provision; and (4) awarding Floyd $500,000 in attorney fees.

¶ 23                                                    Jurisdiction

¶ 24        Relying on *In re Marriage of Alder*, 98 Ill. App. 3d 525 (1981), Paul asserts that the chancery court erred in retaining jurisdiction over this action. We review the issue of subject matter jurisdiction *de novo*. *Board of Trustees of Harvey Police Pension Fund v. City of Harvey*, 2017 IL App (1st) 153095, ¶ 17. The June 30, 2009 order entered in the probate division stated that the court "retain[ed] jurisdiction to enforce the terms of the Settlement Agreement." See *id.* ¶¶ 18-20 (trial court had jurisdiction over motion to enforce settlement agreement where the agreement and dismissal order expressly stated that the court retained jurisdiction). However, the probate court did not retain *exclusive* jurisdiction over enforcement. As per section 20 of the settlement agreement:

> "All disputes and controversies arising out of or in connection with this Agreement shall
> be resolved exclusively by the State or Federal *courts* located in Chicago, Illinois. ***
> Paul agrees to submit personally to, and not contest, the jurisdiction of those *courts* and
> agrees, and will not contest, that venue shall lie exclusively with such *courts*." (Emphasis
> added.)

¶ 25       Illinois circuit courts are courts of general jurisdiction and are empowered to rule on all matters before them. *Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 529-30 (2001) (citing Ill. Const. 1970, art. VI, § 9 ("Circuit Courts shall have original jurisdiction of all justiciable matters except when the Supreme Court has original and exclusive jurisdiction")). We note that Floyd sought injunctive relief in this action, a remedy within the jurisdiction of the chancery division. See Cook County Cir. Ct. G.O. 1.2(b)(1) (Jan. 1, 2008).

¶ 26       In *Alder*, 98 Ill. App. 3d 525, a husband and wife filed petitions for dissolution of marriage in different Illinois counties. Because the action was commenced on the "petitioner in the Iroquois County action before respondent was served in the Cook County action," this court held that the Iroquois County court had priority of jurisdiction. *Id.* at 526-27. As the present case does not involve competing petitions pending in different counties, Paul's reliance on *Alder* is misplaced. Moreover, Paul's contention that "Floyd breached the terms of the Settlement Agreement that required all terms of the Settlement Agreement to be enforced in the *Probate Court*" (emphasis added) is without merit, as the settlement agreement does not so provide. Accordingly, the chancery court did not err in denying Paul's motion to dismiss the complaint.

¶ 27                                    Petition to Substitute Judge

¶ 28       Paul argues that the trial court, per Judge Kathleen Pantle, erred in denying his petition to substitute judge without referring it to another judge. Section 2-1001(a)(3) of the Code of Civil Procedure provides: "Upon the filing of a petition for substitution of judge for cause, a hearing to determine whether the cause exists shall be conducted as soon as possible by a judge other than the judge named in the petition." 735 ILCS 5/2-1001(a)(3) (West 2016). However, "a party's right to have a petition for substitution of judge heard by another judge is not automatic." *In re Estate of Wilson*, 238 Ill. 2d 519, 553 (2010). A judge may deny a petition without referring it to

another judge if it does not meet "threshold requirements," *i.e.*, it "(1) was not timely filed; (2) failed to include an affidavit; or (3) alleged bias not stemming from an extrajudicial source." *Deutsche Bank Nat'l Trust Co. v. Nichols*, 2013 IL App (1st) 120350, ¶ 8.

¶ 29     The factual basis for Paul's petition stemmed from a May 2013 Illinois Attorney Registration and Discipline Commission (ARDC) hearing regarding Floyd's lead attorney, P. Andrew Fleming. Judge Pantle testified at that hearing that Fleming had "a reputation for being honest and truthful." Approximately two months later, the instant case was filed and assigned to Judge Pantle.

¶ 30     On or after December 2, 2015[2], Paul, acting *pro se* because his counsel "refuse[d] to" file the motion, delivered a petition to substitute judge to the presiding judge of the chancery division. He attached an affidavit, dated November 18, 2015, stating he had learned of Judge Pantle's testimony through the ARDC website and did not believe Judge Pantle could be unbiased in his case.

¶ 31     On January 22, 2016, Judge Pantle denied Paul's petition, finding that it was "not *** facially valid" because it was not timely filed. It is well established that a petition for substitution for cause "must be asserted at the earliest practical moment after the cause for the request has been discovered." (Internal quotation marks omitted.) *Wilson*, 238 Ill. 2d at 556. Paul was admittedly aware of the facts underlying his petition no later than November 18, 2015, the date on which his affidavit was notarized. He then "sat on" his petition until after Judge Pantle issued an adverse ruling, quashing Paul's subpoena of the judge who presided over the probate action. As Judge Pantle observed, "[Paul] waited until [the court's] ruling, didn't like it, and then decided to *** move forward with his petition for SOJ for cause. *** [T]hat's just the kind of

_____

[2] The motion is dated December 2, 2015, but the exact date Paul delivered it to the presiding judge's chambers is unknown.

game playing that has been condemned by courts." See *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 30 ("[O]ne may not 'judge shop' until he finds one in total sympathy to his cause. Any other rule would spell the immediate demise of the adversary system." (internal quotation marks omitted)). Based on Paul's failure to meet the "threshold requirement[]" of filing a timely motion, Judge Pantle did not err in denying the motion on its face. *Deutsche Bank*, 2013 IL App (1st) 120350, ¶ 8.

¶ 32                                Waiver of the No-Contact Provision

¶ 33        Paul argues that an issue of fact exists as to whether Floyd impliedly waived the no-contact provision of the settlement agreement. Summary judgment is appropriate where "there is no genuine issue as to any material fact and *** the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2–1005(c) (West 2018). We construe the record strictly against the movant and liberally in favor of the nonmoving parties. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). To prevail, the nonmoving parties must present some evidence that would arguably entitle them to recover at trial. *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (2010). We review the trial court's grant of summary judgment *de novo*. *Williams*, 228 Ill. 2d at 417.

¶ 34        "A waiver is a voluntary relinquishment of a known right, claim or privilege." (Internal quotation marks omitted.) *Klancir v. BNSF Ry. Co.*, 2015 IL App (1st) 143437, ¶ 26. It may be express or implied from conduct. *Hahn v. County of Kane*, 2013 IL App (2d) 120660, ¶ 11. Implied waiver "must be proved by a clear, unequivocal, and decisive act of the party alleged to have committed the waiver." *Id.* Here, the settlement agreement contained a no-waiver clause providing that no waiver by any party "shall be effective unless explicitly set forth in writing and

executed by the Party so waiving." A no-waiver clause may only be waived by clear and convincing evidence. *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 277 (7th Cir. 1996).

¶ 35    Paul's claim of implied waiver is based on Floyd's alleged conduct immediately after the June 2009 settlement conference, plus two phone calls made by Floyd in July 2009. It is undisputed that on July 22, 2009, Floyd's counsel unequivocally advised Paul's counsel that Floyd was "insisting on absolute strict compliance."

¶ 36    As a matter of law, we find that Floyd's brief contacts with Paul were not sufficiently "clear, unequivocal, and decisive" (*Hahn*, 2013 IL App (2d) 120660, ¶ 11) to demonstrate an intent to waive the no-contact clause, particularly in light of the no-waiver clause. In *Transcraft Corp. v. Anna Industrial Development Corp.*, 223 Ill. App. 3d 100 (1991), the parties' lease agreement required the landlord to pay real estate taxes in excess of $800. Despite the landlord's failure to pay the excess taxes for over 20 years, we held the tax provision was "in full force and effect" under the no-waiver clause of the contract. (Internal quotation marks omitted.) *Id.* at 103. Similarly, we find that the no-contact clause at issue in the instant case remained in full force and effect despite Floyd's noncompliance with that provision in June and July 2009.

¶ 37    Paul relies on *City of Chicago v. Michigan Beach Housing Co-op.*, 242 Ill. App. 3d 636, 650 (1993), for the proposition that once a contractual provision has been waived, it cannot subsequently be revived. He argues that Floyd's attempts to assert the no-contact provision on July 22, 2009 (and for the next several years thereafter) were ineffective because the provision had already been waived. We disagree. Since Floyd's alleged actions did not constitute waiver in the first instance, *Michigan Beach* is inapposite.

¶ 38    Finally, Paul argues that enforcement of the no-contact clause is contrary to the public policy of the state, which has an interest in "promot[ing] family tranquility." Significantly, an

expressly stated purpose of the settlement agreement, including the no-contact clause, was to "promote and maintain family harmony" due to "the long history of litigation that has been instituted by Paul" against his sisters and Floyd. Further, it is well-established that public policy "strongly favors freedom to contract" (internal quotation marks omitted) (*Rabin v. Karlin & Fleisher, LLC*, 409 Ill. App. 3d 182, 188 (2011)) and the peaceful and voluntary settlement of disputes via settlement agreements (*Haisma v. Edgar*, 218 Ill. App. 3d 78, 86 (1991)). Enforcement of the settlement to which Paul voluntarily agreed for valid consideration is firmly in keeping with Illinois public policy.

¶ 39                                              Attorney Fees

¶ 40       Paul raises several contentions of error regarding the court's award of attorney fees: (1) the court erred in not holding an evidentiary hearing on the issue of fees; (2) Floyd failed to prove that he paid all the fees that were billed; (3) the billing records were inadequately detailed; (4) the billing records reflect non-compensable overhead and duplication of services; and (5) the fee award of $500,000 is unreasonable "for a straightforward breach of contract case" and "out of proportion to [the] relief sought."

¶ 41       In determining whether the fee sought is reasonable, courts consider a number of factors, including "the skill and standing of the attorneys, the nature of the case, the novelty and/or difficulty of the issues and work involved, the importance of the matter, the degree of responsibility required, the usual and customary charges for comparable services, the benefit to the client [citation], and whether there is a reasonable connection between the fees and the amount involved in the litigation." (Internal quotation marks omitted.) *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 102. "The determination as to what constitutes reasonable compensation is a matter peculiarly within the discretion of the trial court." *Father &*

*Sons Home Improvement II, Inc. v. Stuart*, 2016 IL App (1st) 143666, ¶ 48. We review the trial court's fee award for an abuse of discretion and will not reverse merely because we might have reached a different decision. *Id.* ¶¶ 47-48 (rejecting appellant's argument that circuit court's award of fees was "excessive").

¶ 42       The record reflects that the trial court initially set an evidentiary hearing on Floyd's motion to prove up attorney fees. On September 1, 2017, Paul filed an objection to the hearing, arguing that "this evidentiary hearing tactic is just another bad faith and disingenuous attempt to run up already unconscionable attorney's fees and costs." In response, the court struck the hearing and later declined to re-set it. "Under the doctrine of invited error, a party may not request to proceed in one manner and then later contend on appeal that the course of action was in error." (Internal quotation marks omitted.) *Torres v. Midwest Development Co.*, 383 Ill. App. 3d 20, 31 (2008). Having invited the challenged action, "even if the ruling [was] improper, [Paul] cannot contest the ruling on appeal." *Id.*

¶ 43       In addition, the trial court did not err in finding that Floyd paid the fees that were billed. Floyd's outstanding balance is reflected in the invoices of his law firm, Novack and Macey LLP (NM). Paul argues that the invoices are insufficient to prove payment because they "fail to state what specifically caused the 'balance outstanding' to go down." On the contrary, the record contains an affidavit submitted by NM's business manager, David Yesko, stating that "[w]ith the exception of costs directly paid by Floyd, Novack and Macey LLP has been paid all of the fees and costs sought in the Prove Up Motion and the Supplements thereto."

¶ 44       Paul next contends that NM's billing records were insufficiently detailed to determine the reasonableness of the fees charged. A fee petition must contain "detailed records containing facts and computations upon which the charges are predicated specifying the services performed, by

whom they were performed, the time expended and the hourly rate charged." *Harris Trust & Savings Bank v. Am. Nat'l Bank & Trust Co. of Chicago*, 230 Ill. App. 3d 591, 595 (1992). Here, NM provided over 130 pages of detailed invoices. We recognize that the invoices from February 2013 to February 2014 include instances of "fee bundling," *i.e.* including multiple activities within one entry without apportioning the time between them. However, all of the entries contain significant detail, and none of the invoices submitted after February 2014 contain bundled entries.

¶ 45        Moreover, although NM redacted approximately 50 billing entries that it claimed were attorney-client privileged communications, unredacted copies of the timesheets were reviewed by the trial court *in camera*. See *U.S. Bank Nat'l Ass'n v. Randhurst Crossing LLC*, 2018 IL App (1st) 170348, ¶ 80 (affirming fee award where plaintiff filed redacted timesheets with fee motion and also provided unredacted timesheets for *in camera* review).

¶ 46        In deducting $45,787.49 in fees billed for "internal office communications," the court found that "the invoices reflect an arguably excessive amount of billing by attorneys representing one party merely talking amongst themselves." Concerning general overhead office expenses, *i.e.*, expenses that attorneys incur regardless of specific litigation, such as telephone charges, in-house delivery charges, and newspaper subscriptions, we agree that such expenses are not recoverable as costs of litigation. *Johnson v. Thomas*, 342 Ill. App. 3d 382, 401 (2003). However, Illinois courts are split as to the recoverability of Westlaw fees. See *Harris Trust & Savings Bank v. American Nat'l Bank & Trust Co. of Chicago*, 230 Ill. App. 3d 591, 599-600 (1992) (costs of computer-based legal research are "general overhead office expenses" that cannot be recovered in a fee petition); *900 N. Rush LLC v. Intermix Holdco, Inc.*, 2019 IL App (1st) 181914, ¶ 51 (same, citing *Harris*); but see *Guerrant v. Roth*, 334 Ill. App. 3d 259, 269

(2002) (rejecting *Harris* and holding that "computerized assisted legal research charges are a part of attorney fees"). In *Johnson*, 342 Ill. App. 3d at 403, we held that "a distinction must be made *** based upon the billing method for each individual case." Where an attorney's fee is contingent or does not depend on the actual time spent on a cause of action, fees for computerized legal research are not recoverable; on the other hand, where the attorney charges on an hourly basis, "the attorney should not be required to absorb the additional expense engendered by computer research fees in light of the diminished billable hours that result from such computer assistance." *Id.* Following *Johnson*, we find that the Westlaw fees incurred by Floyd's attorneys were properly recoverable.

¶ 47    Finally, Paul argues that the fee award of $500,000 is unreasonably high "for a straightforward breach of contract case." The record belies Paul's characterization. Due to the ongoing acrimony between the parties, this litigation was unusually contentious, protracted, and complex. The proceedings below lasted almost seven years, due in large part to Paul's litigious conduct, including filing repetitive motions and seeking to change judges six times over the course of the litigation. Where a fee-shifting provision applies, if one party "vexatiously delays" a claim, he must bear the expense resulting from the other party's efforts to prosecute the claim. *Verbaere v. Life Investors Insurance Co. of America*, 226 Ill. App. 3d 289, 300 (1992). Here, the parties filed numerous motions involving a variety of complicated legal issues, including jurisdiction, rescission, unconscionability, and principles of waiver and estoppel. The record does not support Paul's claim that the trial court abused its discretion in awarding attorney fees to Floyd in the amount of $500,000.

¶ 48                                    CONCLUSION

¶ 49    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 50        Affirmed.