**In re KEENE CORP., Debtor.**

**Bankruptcy No. 93 B 46090 (SMB).**

United States Bankruptcy Court,
S.D. New York.

Oct. 17, 1995.

---

Berlack Israels & Liberman, (Edward S. Weisfelner, of counsel), New York City, for Debtor Keene Corporation.

Marcus Montgomery Wolfson, P.C., (John J. Preefer, Eric P. Wainer, of counsel, and Jeanne L. Schroeder, Special Counsel), New York City, for Official Committee of Unsecured Creditors of Keene Corp.

Mayer Brown & Platt (Lawrence K. Snider, Richard G. Ziegler, John J. Voorhees, Jr., Raniero D'Aversa, of counsel), Chicago, Illinois, for Bank of America Illinois, f/k/a Continental Bank, N.A.

## MEMORANDUM DECISION AND ORDER DENYING MOTION TO MODIFY THE AUTOMATIC STAY

STUART M. BERNSTEIN, Bankruptcy Judge.

The matter before the Court involves the analytically complex, related issues of how to

create a security interest in book-entry Treasury securities, and how to describe that interest in a security agreement. Bank of America Illinois, formerly known as Continental Bank N.A. (the "Bank"), moves to modify the automatic stay,[1] and to foreclose its claimed security interests in book-entry Treasury notes pledged by the debtor ("Keene") to secure certain debts to the Bank. These debts—contingent reimbursement obligations—become fixed when the Bank honors letters of credit issued at Keene's request to secure supersedeas bonds. *See Keene Corp. v. Acstar Insur. Co.* (*In re Keene Corp.*), 162 B.R. 935, 939 (Bankr.S.D.N.Y.1994).

■ For the reasons that follow, the Court holds that, where the Bank was already holding a book-entry Treasury security as Keene's bailee or agent, Keene was required to sign a security agreement in order to pledge that security to the Bank. While many of the transactions between Keene and the Bank clearly fall into this category, others may not, and an evidentiary hearing is necessary to resolve this question.[2] In those instances where written security agreements were required, the Court further holds that the agreements between Keene and the Bank are ambiguous, and the Court must conduct an evidentiary hearing to determine what they mean.

## FACTS

The background facts are set forth in *Keene Corp. v. Acstar Insur. Co.* (*In re Keene Corp.*), 162 B.R. 935 (Bankr.S.D.N.Y. 1994). As more fully described in that opinion, Keene was actively defending many asbestos-related lawsuits when it filed its chapter 11 petition on December 3, 1993. Several of the plaintiffs in those cases had already obtained money judgments against Keene, and Keene's appeals were pending on the petition date. Prior to the petition, Keene had posted supersedeas bonds to stay the enforcement of many of these judgments while it appealed. If Keene's appeal ultimately failed, the judgment creditor could look to the corresponding supersedeas bond to satisfy his claim.

The Bank played an integral role in enabling Keene to procure the necessary supersedeas bonds from the sureties that issued them. A surety will not issue such a bond unless the bond is collateralized. Keene would, therefore, ask the Bank to issue a standby letter of credit for the benefit of the surety; if the judgment creditor looked to the surety for satisfaction, the surety, in turn, could collect the proceeds of the letter of credit from the Bank.

The Bank would not, however, issue the letter of credit without receiving collateral from Keene. If the judgment creditor enforced the bond and the surety collected the proceeds of the letter of credit, the Bank would then have recourse against Keene's collateral to satisfy Keene's reimbursement obligation.

It is the nature of the Collateral—book-entry United States Treasury notes—that makes the analysis complex.[3] Although the United States Government formerly issued and sold Treasury securities in certificated form, it no longer does so; since mid–1986, the Treasury Department has issued Treasury securities only in book-entry form. Egon Guttman, *Modern Securities Transfers*, ¶ 5.04[1], at 5–69 (3d ed. 1987) ("Guttman").

Its regulations governing the book-entry procedure create a two-tiered system of own-

---

1. The debtor has not opposed the motion but the Official Committee of Unsecured Creditors (the "Committee") has.

2. The parties' dispute concerns the extent, validity and priority of the Bank's lien in Keene's property, and requires an adversary proceeding. Fed.R.Bankr.P. 7001(2). The Court, with the parties' consent, has treated the Bank's motion for relief from the automatic stay as an adversary proceeding, and has treated the current matter before it as a motion for summary judgment within that proceeding.

3. Much of the general discussion in this opinion regarding book-entry securities is derived from *Cohen v. Army Moral Support Fund* (*In re Bevill, Bresler & Schulman Asset Management Corp.*), 67 B.R. 557, 568–70 (D.N.J.1986).

ership. The Federal Reserve Bank of New York (the "Fed"), the Treasury Department's primary fiscal agent in the government securities market, Guttman ¶ 5.04[1] n. 370, at 5–67, establishes and maintains book-entry accounts for Member banks,[4] and only Member banks can become registered owners of such securities. *See* 31 C.F.R. § 306.117(a)(2), (a)(3). Non–Member banks can maintain interests in book-entry Treasury securities only through an account with a direct or indirect intermediary of a Member bank. The Fed only records the interests of its Member banks on its books and records. Member banks, in turn, record the interests of their customers on their own books and records. Thus, although a Member bank can and often does hold a book-entry security for one of its customers, the Fed's records reflect only the Member bank's ownership while the Member bank's records reflect its customer's ownership.

The unique nature of book-entry Treasury securities means that the customer of the Member bank, or other financial intermediary, owns a bundle of rights rather than a specific, identifiable security. The Fed is deemed to hold the Member bank's book-entry securities in fungible bulk notwithstanding that a Member bank has identified the securities as belonging to a particular customer. Guttman ¶ 5.04, at 5–70, 5–73. In a single account with the Fed, the Member bank may hold securities that it has allocated to many customers on its own books and records. The customer "owns" an account with the Member bank and not the fungible bulk of securities that underlies the account. Charles W. Mooney, Jr., *Beyond Negotiability: A New Model for Transfer and Pledge of Interests in Securities Controlled by Intermediaries*, 12 Cardozo L.Rev. 305, 310–11 (1990) ("Mooney"); *see* Barry Lee Katzman,

*Security Interests in Federal Agency Book–Entry Securities: Doing It With Mirrors*, 42 Bus.Law. 157, 185 (1986) ("Katzman"). Consequently, the customer's pledgee does not obtain a lien on any specific security, but instead, receives a security interest in the customer's claim to a *pro rata* share of the fungible bulk. *See* Jeanne L. Schroeder, *Is Article 8 Finally Ready this Time? The Radical Reform of Secured Lending on Wall Street*, 3 Colum.Bus.L.Rev. 291, 382 (1994).[5] Nevertheless, as we discuss below, the Fed has created the fiction that the customer owns a certificated security held for its benefit by the financial intermediary. Mooney at 311.

As of the filing of Keene's chapter 11 petition, the Bank had issued 36 letters of credit that remained outstanding. These letters of credit bore an aggregate face amount exceeding $34,500,000.00. To secure these letters of credit, Keene purported to pledge certain book-entry United States Treasury Securities (the "Collateral") held in a short term asset management account (the "STAM Account") that Keene had established with the Bank.[6]

The STAM Account included certain cash equivalents, one issue of corporate bonds and thirteen distinct issues or series of Treasury notes distinguished by different maturity dates and interest rates. The thirteen series had an aggregate par value of $46,222,000.00, and Keene's holdings in each issue ranged from $1,500,000.00 to $8,345,000.00. Keene's book-entry securities were maintained in one of the Bank's accounts with the Fed, and this account also held other book-entry securities that the Bank held on behalf of its other customers. Rosenwinkel Affidavit ¶ 5.

Keene and the Bank executed at least one and often several separate security agree-

---

4. The Bank is a Member bank. Affidavit of Wayne Rosenwinkel, sworn to September 29, 1994 ("Rosenwinkel Affidavit"), at ¶ 4.

5. As long as the financial intermediary remains solvent, the customer achieves the benefit of indirect ownership of the underlying securities. Mooney at 311. If the financial intermediary becomes insolvent, however, the customer only holds a priority claim to its *pro rata* share of the

existing fungible bulk, and must share the fungible bulk ratably with other customers who hold similar claims. *Id.*

6. As of the petition date, the STAM Account held over $53,000,000.00 in cash equivalents, corporate bonds, and Treasury notes.

ments corresponding to each letter of credit,[7] although the Bank disputes the need for written security agreements to create a valid security interest. Nevertheless, the Committee contends that the security agreements contain certain defects, discussed below, and consequently, fail to adequately describe the Bank's Collateral. Because the Committee focuses on the sufficiency of the security agreements, the Court must consider the threshold issue of whether a written agreement is required to create and perfect the Bank's security interest.

## DISCUSSION

### A. The Necessity Of A Written Security Agreement

#### 1. Introduction

██ Perfection of security interests in book-entry Treasury securities is governed by 31 C.F.R. § 306.118. Subsection (a) concerns transfers and pledges between the Fed and the Member banks; it pre-empts state law and is dispositive for the purpose of determining who the Fed is legally obligated to pay. *See Wichita Federal Sav. & Loan Ass'n v. Comark,* 610 F.Supp. 406, 418 (S.D.N.Y.1985). Subsection (a) is not applicable to the present dispute.

██ Rather, subsection (b)[8], which governs the respective rights of a Member bank

and its customer in book-entry Treasury securities that a Member bank holds for its customer's benefit, controls the issue. Subsection (b) creates the fiction that book-entry Treasury securities are certificated (*viz.* represented by a physical certificate), and states that issues of transfer and perfection are governed by applicable law. The applicable law in this case is state law, and in particular, Article 8 of the Uniform Commercial Code ("UCC"). *See Oscar Gruss and Son v. First State Bank of Eldorado,* 582 F.2d 424, 426 (7th Cir.1978); *Connecticut Nat'l Bank v. Babco, Inc. (In re Babco, Inc.),* 133 B.R. 286, 290 (Bankr.D.Conn.1991); Jeanne L. Schroeder & David G. Carlson, *Security Interests Under Article 8 of the Uniform Commercial Code,* 12 Cardozo L.Rev. 557, 560 (1990) ("Schroeder & Carlson"). The parties' security agreements state that Illinois law shall govern, and hence, the applicable state law in this matter is Illinois' version of the UCC.[9]

#### 2. The UCC Requirements

██ Article 8 of the Uniform Commercial Code governs the creation, perfection and attachment of security interests in investment securities. In general, the Article 8 security interest is subject to the provisions of Article 9 with two important exceptions. First, the secured party need not perfect its interest through filing.[10] Second, a written security agreement signed by the debtor is

---

**7.** As of the petition date, 69 separate security agreements secured 36 letters of credit. Where the same surety had issued several bonds, the parties would sometimes collateralize the several bonds through a single letter of credit rather than procure a new letter of credit for each additional bond. Supplemental Affidavit of Ruth E. Gross, sworn to Sept. 29, 1994, at ¶ 3. Keene nonetheless executed and delivered an additional security agreement for each additional bond. *Id.* For example, 13 security agreements, all dated April 16, 1993, secure letter of credit no. C 7187108 with a face amount of $4,487,249.29.

**8.** 31 C.F.R. § 306.118(b) provides, in pertinent part, as follows:

A transfer or pledge of transferable Treasury securities, or any interest therein, which is maintained by a Reserve bank (in its individual capacity or as fiscal agent of the United States) in a book-entry account under this subpart ...

is effected, and a pledge is perfected by any means that would be effective under applicable law to effect a transfer or to effect and perfect a pledge of the Treasury securities, or any interest therein, if the securities were maintained by the Reserve bank in bearer definitive form....

"Definitive form" means Treasury securities, including notes, "in engraved or printed form." 31 C.F.R. § 306.115(c).

**9.** The Bank is an Illinois bank, and Illinois bears a reasonable relation to the transactions. The choice of law clause is, therefore, enforceable. UCC § 1–105. Unless otherwise stated, references to the UCC refer to the UCC as enacted in Illinois.

**10.** See UCC § 9–402.

not necessary, "except as provided in paragraphs (h), (i) or (j) of Section 8–313(1)". UCC § 8–321(3)(b).

 UCC § 8–321(1) provides that a security interest in an investment security is enforceable and attaches only if it is "transferred" to the secured party or person designated by him pursuant to UCC § 8–313(1).[11] *Accord United States v. 105,800 Shares of Common Stock of FirstRock Bancorp, Inc.,* 830 F.Supp. 1101, 1120 (N.D.Ill.1993). Section 8–313(1) sets forth ten methods of transferring an investment security, including a limited interest such as a security interest. These methods are exclusive, and a transferor must comply with one of these methods to "transfer" an investment security. UCC § 8–313, Official Uniform Comment No. 1.

 Section 8–313(1) covers many different types of transfers, including outright transfers and bailments as well as pledges. While it prescribes ten transfer methods, only three—subparagraphs (h), (i) and (j)—require a debtor to sign a security agreement. It is therefore possible, at least in the abstract, to transfer a security interest under one of the other methods without the need to sign a security agreement. We assume for the sake of argument that when Keene pledged a book-entry Treasury security already "on deposit" in its STAM Account, it followed procedures that satisfied one of the other subsections that did not require a written security agreement.[12] The question is whether that suffices in this case.

The face of UCC § 8–313(1) does not state that any one transfer method applies to the

exclusion of all other methods. The Committee nevertheless argues that subparagraph (j) applies to those situations in which Keene pledges a security already "on deposit" with the Bank, and if subparagraph (j) does apply, it does so to the exclusion of all other transfer methods set out in UCC § 8–313(1).

### 3. The Applicability of UCC § 8–313(1)(j)

Section 8–313(1)(j) provides that a transfer occurs

> with respect to the transfer of a security interest where the secured party is a financial intermediary and the security has already been transferred to the financial intermediary under paragraphs (a), (b), (c), (d), or (g), at the time the transferor has signed a security agreement containing a description of the security and value is given by the secured party.

Section 8–313(1)(j) addresses the situation in which the debtor borrows from its broker or banker who already holds the investment securities as bailee or agent. *See* Schroeder & Carlson at 613. The financial intermediary's status thereby changes from mere bailee (or agent) to bailee (or agent)/pledgee. The change in status creates a potential ambiguity, and the Reporter's comments to the revised Article 8 spell out the importance of the written security agreement in that situation:

> Subparagraph (j) is addressed to the situation where a financial intermediary holds securities in account for a customer and also acquires a security interest in
>
> . . . .
>
> (d) at the time a financial intermediary, not a clearing corporation, sends him confirmation of the purchase and also by book entry or otherwise identifies as belonging to the purchaser . . . (ii) a quantity of securities that constitute or are part of a fungible bulk of certificated securities in the financial intermediary's possession or of uncertificated securities registered in the name of the financial intermediary.
>
> The Bank contends that the Keene pledges satisfy both of these provisions.

---

**11.** A transfer of a security interest in accordance with UCC § 8–313(1) also results in a perfected security interest. *United States v. 105,800 Shares,* 830 F.Supp. at 1120; *see* UCC § 8–321(2).

**12.** Because the Bank is a "financial intermediary", *see* UCC § 8–313(4), and the Collateral consists of book-entry Treasury securities deemed to be certificated, 31 C.F.R. § 306.118(b), only two such methods conceivably could apply. In this regard, a transfer, including a pledge, occurs under UCC § 8–313(1)

> (a) at the time he or a person designated by him acquires possession of a certificated security; [or]

those securities for its own account, e.g., a margin account with a broker or a bank lending on the collateral of its borrower's custody account. In such cases, the financial intermediary's control of the securities is in a dual capacity, and a written agreement signed by the debtor was thought to be a desirable protection.

UCC § 8–313, Official Reasons for 1977 Change, 2C U.L.A. 404–05 (1991).

As discussed below, the Bank held the majority of Keene's book-entry Treasury securities as Keene's bailee or agent before Keene ever pledged the securities to the Bank. In a sense, Keene, like any other bank depositor, kept its unencumbered Treasury securities in an account maintained by the Bank. The Bank had purchased those securities on behalf of Keene at the direction of Timothy Coyne, Keene's vice president for finance, Affidavit of Timothy Coyne, sworn to June 22, 1995 ("Coyne Affidavit") at 4, and the seller would have transferred the securities to the Bank, as Keene's agent, under one of the other provisions of UCC § 8–313(1), presumably subsections (a) or (d).

 Keene's subsequent pledge of these securities fits squarely within the language of paragraph (j). The securities had already been transferred to the Bank—a financial intermediary—under one of the other provisions stated in subparagraph (j), and Keene then transferred a security interest to the Bank. If Keene could transfer that security interest under paragraphs (a) or (d)

without signing a security agreement, the transfer could create the very ambiguity that the drafters, through subparagraph (j), were trying to avoid. Further, it would be the rare transfer that would satisfy paragraph (j) but not satisfy paragraphs (a) or (d) which are less formal and require minimal action or documentation.

We agree with the Committee's interpretation, and construe section 8–313(1)(j) to be the exclusive method for a customer to transfer a security interest in an investment security to a bank which already holds that security for the customer's benefit.[13] Accordingly, we hold that Keene had to sign a security agreement in order to pledge a book-entry Treasury security to the Bank that was already "on deposit" in its STAM Account.

### 4. The Securities Pledged By Keene

At the Court's request, the Bank submitted a summary[14] of its Collateral as of the petition date, indicating the date that the Bank acquired a particular Treasury security on Keene's behalf and the date that Keene pledged it. According to the summary, 29 of the 36 letters of credit are secured, in whole or in part, by pledges of Treasury securities held by the Bank as Keene's bailee or agent. These pledges aggregate $26,307,897.80, and under our holding, *supra*, required a written security agreement to effect a transfer.

The Bank contends that it acquired the balance of the Collateral on Keene's behalf contemporaneously, substantially contemporaneously or even after the date that Keene

---

**13.** New York's failure to adopt section 8–313(1)(j) as part of its Uniform Commercial Code does not affect this conclusion. The Court invited briefing regarding the reason for its omission, and received an explanation that attributes the omission of subsection (j) to "serendipity." Subsection (j) was not included by the original drafters in an earlier version of the proposed revised Article 8, but was subsequently added in 1977 following a review by the American Law Institute.

New York did not adopt the revised Article 8 until 1982. The task of shepharding the proposed legislation through the state legislature fell upon the New York Commissioners of Uniform State Laws. Unfortunately, the Commissioner primarily responsible for the matter became ill, and his

office mistakenly photocopied and transmitted to the legislative sponsors the earlier draft that did not contain section 8–313(1)(j). No one noticed the error, and New York duly enacted the earlier draft.

Although 13 years have now passed, the legislature has never corrected the error. According to the Committee, the lawyers who represent financial intermediaries dominate the groups which originally recommended the revised Article 8, and have little incentive to lobby for its change.

**14.** See Summary of Collateral Description and Date Treasury Notes Purchased and First Pledged, received April 5, 1995.

pledged it. This argument applies primarily to many of the security agreements dated April 16, 1993 and June 14, 1993. The Bank argues that when Keene pledged these securities, they were not already "on deposit" in the STAM Account, and even under the Committee's interpretation of UCC § 8-313(1)(j) (and the Court's holding), Keene did not have to sign a security agreement to transfer the security interest to the Bank.

The Committee's evidentiary submissions cast doubt on these facts. According to Mr. Coyne, the security agreements, dated June 14, 1993,[15] are probably misdated and were actually signed and delivered one month later. (Coyne Affidavit ¶ 9.) The Bank purchased these securities for Keene on July 7, 1993. If Mr. Coyne is correct, Keene did not pledge these securities until one week *after* the Bank acquired them and presumably place them—unencumbered—in the STAM Account.

Moreover, Mr. Coyne rebuts the suggestion that Keene could ever have pledged specific Treasury securities more than one or two days prior to the date of their purchase. He would not decide which Treasury securities to purchase until the date of the actual purchase, or on rare occasions, one day prior to the actual purchase. (Coyne Affidavit ¶ 5.) Yet, the summary lists five security agreements, allegedly dated April 16, 1993, under which Keene pledged Treasury securities that it did not purchase until May 19, 1993. All five agreements relate to letter of credit no. C7187108, and purport to encumber Collateral with a "par value" of $1,115,567.78. Mr. Coyne's affidavit casts doubt on the Bank's factual assertion that Keene pledged these Treasury securities more than one month before they were acquired.

■ Further, many of the remaining security agreements bear dates one day *after* the day that Keene purchased the particular Treasury security. The contemporaneous or near contemporaneous acquisition and pledge of a Treasury security does not lead, without more, to the conclusion that a written security agreement was not required. To the contrary, the one day difference between the acquisition and pledge of a particular Treasury security supports rather than undercuts the conclusion that the Bank held the securities, however briefly, solely as Keene's agent or bailee and without a lien.

■ As the foregoing demonstrates, substantial factual issues prevent us from deciding whether Keene pledged the balance of the securities only after they were already "on deposit" in the STAM Account, or alternatively, Keene pledged them before or simultaneously with their acquisition by the Bank on Keene's behalf. Accordingly, we cannot determine as a matter of law if Keene had to sign a security agreement to transfer a security interest in any of these Treasury securities to the Bank, and we must conduct an evidentiary hearing to resolve the question.

## B. The Sufficiency of the Security Agreements

### 1. Introduction

■ If a written security agreement is required, the next question is whether the security agreement, and specifically the description of Collateral, is valid under Illinois law. Article 8 does not contain a provision establishing the type of collateral description that a security agreement must contain, and the Court may look to the analogous provisions of Article 9. *See Third Nat'l Bank v. Fischer (In re Fischer)*, 184 B.R. 293, 299 (Bankr.M.D.Tenn.1995); *Wolff v. FWB Bank (In re Richman)*, 181 B.R. 260, 264–65 (Bankr.D.Md.1995); *In re Clinton Hosp. Ass'n*, 142 B.R. 601, 604 (Bankr.D.Mass. 1992).

■ This approach is supported by the language in UCC § 8–321(3). It makes Arti-

---

15. These security agreements pertain to the following letters of credit identified in the Bank's summary: C7184694, C7200260, C7202778, C7203064, C7204264, C7204275, C7204286, C7204297 and C7204253. The pledges under these security agreements aggregate $8,321,707.98 in "par value."

cle 8 security interests subject to Article 9 except for the requirements relating to filing and a written security agreement. Where the written security exception does not apply, *i.e.,* the court determines that a written security agreement is required to create and perfect an Article 8 security interest, the provisions in Article 9 governing the sufficiency of the security agreement necessarily control.

■ Under UCC § 9–203(1)(a)—and hence, under UCC §§ 8–321(3)(a) and 8–313(1)(j)—the debtor must sign a "security agreement which contains a description of the collateral." [16] Section 9–110 states, with deceptive simplicity, that a "description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described." *Accord NBD Park Ridge Bank v. SRJ Enterprises, Inc. (In re SRJ Enterprises, Inc.),* 151 B.R. 198, 200 (Bankr.N.D.Ill.1993); *City of Chicago v. Michigan Beach Hous. Co-op,* 242 Ill.App.3d 636, 644, 182 Ill.Dec. 343, 350, 609 N.E.2d 877, 884 (Ill.App.Ct.1993). According to the Official Uniform Comment, "[t]he test of sufficiency of a description laid down by this section is that the description do the job assigned to it—that it make possible the identification of the thing described." [17] *Accord In re SRJ Enterprises, Inc.,* 151 B.R. at 200; *Midkiff Implement Co. v. Worrall,* 116 Ill.App.3d 546, 548, 71 Ill.Dec. 655, 657, 451 N.E.2d 623, 625 (Ill.App.Ct.1983). To be sufficient, the description must enable a third party to distinguish between the collateral and other, similar goods that the debtor owns, *Aronson Furniture Co. v. Johnson,* 47 Ill.App.3d 648, 653, 7 Ill.Dec. 776, 780, 365 N.E.2d 61, 65 (Ill.App.Ct.1977); *see Midkiff Implement Co. v. Worrall,* 116 Ill.App.3d at 549, 71 Ill.Dec. at 657, 451 N.E.2d at 625; *see generally* William D. Hawkland, *et al., Uniform Commercial Code Series* § 9–110:03 (1991), and the security interest is limited to the property described in the security agreement. *In re Martin Grinding & Machine Works, Inc.,* 793 F.2d 592, 594–95 (7th Cir. 1986); *Allis–Chalmers Corp. v. Staggs,* 117 Ill.App.3d 428, 432, 72 Ill.Dec. 840, 843, 453 N.E.2d 145, 148 (Ill.App.Ct.1983).

■ With these standards in mind, we turn to the parties' contentions regarding the sufficiency of each security agreement. As with any security agreement, we start with the "granting clause." Paragraph 2 of each security agreement provides as follows:

> As security for the payment of all liabilities, Borrower hereby pledges and assigns to the Bank, and grants to the Bank a continuing security interest in the following, whether now or hereafter existing or acquired: the Treasury Note held in Borrower's short-term management account no. 40–00862–5 with the Bank, together with all cash, Treasury Securities and other property at any time substituted therefor or purchased in whole or in part directly or indirectly with the proceeds thereof, and all rights with respect to, and all proceeds of, any of the foregoing.

The granting clause, standing alone, lacks a sufficient description of the Collateral. Although it identifies, by number, Keene's only STAM Account, it fails to distinguish among the many Treasury notes and other assets maintained in the account at the time. The

---

**16.** In contrast to UCC § 9–203(1)(a), subsection (j) requires the debtor to sign a security agreement "containing a description of the security." UCC § 8–102(c) states that a certificated "security" "may" mean either the "intangible interest, the instrument representing the interest, or both, as the context requires." We do not view the distinction as a significant one in this case because the adequacy of the description under both provisions rises or falls as one.

**17.** This is a slightly different and arguably stricter standard than the standard governing the sufficiency of financing statements. UCC § 9–402 sets forth the description requirements in more specific detail, but concludes with the following proviso:

> A financing statement substantially complying with the requirements of this Section is effective even though it contains minor errors which are not seriously misleading." [UCC § 9–402(8)].

Even where Article 8 requires a written security agreement, it does not require the filing of a financing statement. *See* UCC § 8–321.

parties agree that none of the security agreements were intended to grant a security interest in every issue of Treasury notes or in any other assets in the STAM Account, and hence, the granting clause does not enable a third party to distinguish the Collateral from similar, unencumbered property.

■■■ Other parts of the security agreement can supplement the granting clause where the parties so intend. *See In re HRC Joint Venture,* 175 B.R. 948, 952 (Bankr. S.D.Ohio 1994); *cf. Mitchell v. Shepherd Mall State Bank,* 458 F.2d 700, 703 (10th Cir.1972) (declining to extend the grant to include collateral described in another part of the security agreement because the parties did not express that intention). The Bank points to the Definitions (Paragraph 1) in the security agreement to supplement the insufficient description in the granting clause.

With some exceptions, the security agreements do not contain a definition of "Treasury Note," the only Collateral referred to in the granting clause.[18] Instead, the typical security agreement contains a definition of "Corporate Note":

> *"Corporate Note"* shall mean the following Treasury Security held in Borrower's short-term asset management account no. 40–00862–5 with the Bank: $678,029.05 par value Treasury Note maturing May 15, 1996.

Each security agreement that defines "Corporate Note" differs in only two respects from every other security agreement that defines "Corporate Note." First, the "par value" of the Treasury note is different. Second, unless a particular issue of Treasury notes is pledged under more than one security agreement, the maturity date will also differ.

The Committee contends that including a definition of "Corporate Note" rather than "Treasury Note" renders the security agreement defective, and misdescribes the Collateral. The parties intended to create a security interest in a Treasury security, and did not intend to create a security interest in the only corporate security that Keene had in its STAM Account on the petition date.

Further, the Committee asserts that with only three exceptions, the pledged notes bear "par values" in dominations that do not exist.[19] "Par value" means the amount which the Fed will pay to redeem the Treasury note at maturity. 31 C.F.R. § 356.5(b). The Fed sells book-entry Treasury securities in multiples of $1,000.00, and investors can only hold these securities in the same multiples. *See* Public Debt News PA–115 (Jan. 26, 1993). The multiples equate to the "par value", and no book-entry security could be transferred or held in a different multiple. This supports the Committee's argument that the majority of the security agreements describe a Treasury note that does not exist.

In response, the Bank argues that the inclusion of a definition of "Corporate Note" is an obvious and readily apparent mistake. Further, says the Bank, the reference to Treasury notes of a specific "par value" means the dollar value of the amount of its security interest in the particular Treasury issue, and does not describe a specific Treasury security. (*See* Supplemental Brief of Bank of America Illinois Regarding Perfection of Security Interests ("Bank's Supp. Br."), dated Feb. 8, 1995 at 3; Response to the Objection of the Official Committee of Unsecured Creditors to Motion of Continental Bank, N.A. Granting Relief from the Automatic Stay ("Bank's Response"), dated Sept. 30, 1994, at 28. In other words, each

---

18. The exceptions include the security agreements pertaining to letter of credit nos. C7171874, C7179184, C7207648, C7207637, C7207626, C7207615, C7207604 and C7207585. These security agreements, which purport to encumber Treasury securities with an aggregate par value of $5,498,705.74, contain a definition of "Treasury Note" rather than "Corporate Note."

19. According to the Bank's Summary, the following letters of credit are secured in whole or part by series of book-entry Treasury securities pledged in multiples of $1,000.00: C7176465 and C7184694

security agreement grants an interest up to a certain dollar amount in an entire Treasury issue, rather than a specific note in that issue, and the Bank criticizes the Committee for its inability to recognize this distinction. (*See* Bank's Response at 29) ("The fallacy of the Committee's argument is its failure to distinguish between a security interest in specific items of collateral and a security interest in a specified dollar amount of all of a type of collateral in the debtor's possession.").

The parties' positions raise a parol evidence issue. The Committee asks us to construe each security agreement from within its "four corners;" the Bank, on the other hand, invites us to consider extrinsic evidence to interpret the meaning of the Collateral description. The resolution turns on the applicability and effect of Illinois' parol evidence rule. Consequently, we must address this issue in some detail.

## 2. The Parol Evidence Rule Under Illinois Law

 "The principal objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the contract." *USG Corp. v. Sterling Plumbing Group, Inc.*, 247 Ill.App.3d 316, 318, 186 Ill.Dec. 830, 831, 617 N.E.2d 69, 70 (Ill.App.Ct.1993); *accord Meyer v. Marilyn Miglin, Inc.*, 273 Ill.App.3d 882, 210 Ill.Dec. 257, 261, 652 N.E.2d 1233, 1237 (Ill.App.Ct.1995). Under the "four corners" rule, "if a contract is clear on its face and the text contains no clue that the contract might mean something different from what it says, then the inquiry is over—no evidence outside of the contract may be considered." *Home Insur. Co. v. Chicago & Northwestern Trans. Co.*, 56 F.3d 763, 767 (7th Cir.1995). Ambiguity is a question of law to be determined by the court. *See, e.g., R.T. Hepworth Co. v. Dependable Insur. Co.*, 997 F.2d 315, 318 (7th Cir.1993); *Sunstream Jet Express, Inc. v. International Air Service Co.*, 734 F.2d 1258, 1266 (7th Cir.1984); *Meyer v. Marilyn Miglin, Inc.*, 210 Ill.Dec. at 261, 652 N.E.2d at 1237.

In recent years, the Illinois courts, particularly the Seventh Circuit Court of Appeals, have extensively criticized the rationale of the "four corners" rule and its corollary, the limitation on the use of parol evidence, to explain a facially clear agreement. In *AM Int'l, Inc. v. Graphic Management Assocs., Inc.*, 44 F.3d 572, 575 (7th Cir.1995), Judge Posner observed that the "four corners" rule "is better regarded as a generalization than as the premise of a syllogism," opining that a court cannot understand or construe a contract in a vacuum:

> [A] clear document can be rendered unclear—even have its apparent meaning reversed—by the way in which it connects, or fails to connect, with the activities that it regulates. Discrepancy between the word and the world is a common source of interpretive problems everywhere.

*Id.* at 577; *accord URS Corp. v. Ash*, 101 Ill.App.3d 229, 234, 56 Ill.Dec. 749, 753, 427 N.E.2d 1295, 1299 (Ill.App.Ct.1981) (The "four corners" rule has two flaws: "it assumes a precision in language which cannot exist," and requires the trial judge to determine "the true intent of the parties in a transaction to which he is far removed both in time and circumstance.").

Recent Seventh Circuit Cases—*R.T. Hepworth Co. v. Dependable Insur. Co.*, 997 F.2d 315 (7th Cir.1993), *AM Int'l, Inc. v. Graphic Management Assocs., Inc.*, 44 F.3d 572 (7th Cir.1995) and *Home Insur. Co. v. Chicago & Northwestern Transp. Co.*, 56 F.3d 763 (7th Cir.1995)—have redefined the "four corners" rule, and reconciled seemingly inconsistent Illinois case law. After reviewing and comparing the cases that adhere to the traditional "four corners" rule and refuse to admit parol evidence if the contract is clear on its face, see *Home Insur. Co. v. Chicago & Northwestern Transp. Co.*, 56 F.3d at 767 (citing Illinois cases); *AM Int'l, Inc. v. Graphic Management Assocs., Inc.*, 44 F.3d at 574 (same), with those that admit extrinsic evidence even when the meaning of the contract appears clear, see *AM Int'l, Inc. v. Graphic Management Assocs., Inc.*, 44 F.3d 572, 574 (7th Cir.1995) (citing cases), the

Seventh Circuit concluded that Illinois has largely rejected the "four corners rule," and permits courts to look to extrinsic evidence in order to discover the parties' genuine intent. *Home Insur. Co. v. Chicago & Northwestern Transp. Co.*, 56 F.3d at 767; *R.T. Hepworth Co. v. Dependable Insur. Co.*, 997 F.2d at 318; *accord Ginocchio v. American Bankers Life Assurance Co.*, 889 F.Supp. 1078, 1081 (N.D.Ill.1995).

Under current Illinois law, therefore, a court may consider parol evidence *provisionally* to determine if an agreement, clear on its face, is ambiguous. In this regard, the cases distinguish between intrinsic and extrinsic ambiguity. A document is intrinsically ambiguous when it is "internally unclear or inconsistent as when it is 'reasonably and fairly susceptible to more than one meaning.'" *Home Insur. Co. v. Chicago & Northwestern Transp. Co.*, 56 F.3d at 768 (quoting *Lenzi v. Morkin*, 116 Ill.App.3d 1014, 72 Ill.Dec. 414, 416, 452 N.E.2d 667, 669 (Ill.App.Ct.1983)); *accord CSX Transp., Inc. v. Chicago & North Western Transp. Co.*, 62 F.3d 185, 189 (7th Cir.1995); *Sunstream Jet Express, Inc. v. International Air Service Co.*, 734 F.2d at 1269; *FDIC v. Glynn*, 1995 WL 571418 at *4 (N.D.Ill. Sept. 25, 1995); *American Nat'l Bank & Trust Co. v. Northern Trust Co.*, 1995 WL 443917 at *3 (N.D.Ill. July 24, 1995). The fact that parties disagree on the meaning does not necessarily make the agreement ambiguous. *Home Insur. Co. v. Chicago & Northwestern Transp. Co.*, 56 F.3d at 769; *Northern Illinois Hosp. Services, Inc. v. Marriott Management Services Corp.*, 1995 WL 545050 at *1 (N.D.Ill. Sept. 13, 1995); *American Nat'l Bank & Trust Co. v. Northern Trust Co.*, 1995 WL 443917 at *3 (N.D.Ill. July 24, 1995). In determining whether a document is intrinsically ambiguous, a court cannot add a term about which the agreement is silent to reach a more equitable result, or delete a term to change the plain and ordinary meaning of the contractual terms. *Home Insur. Co. v. Chicago & Northwestern Transp. Co.*, 56 F.3d at

769. Intrinsic ambiguity corresponds to the traditional "four corners" rule, and represents nothing new; a court can always receive parol evidence to explain an agreement that is ambiguous on its face.

The "four corners" rule breaks down, however, under the concept of extrinsic ambiguity. A document is extrinsically ambiguous if it is clear on its face, but someone who knows the context of the contract would know that the contract "means something other than what it seems to mean." *Home Insur. Co. v. Chicago & Northwestern Transp. Co.*, 56 F.3d at 768; *accord Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 567–68 (7th Cir.1995); *CSX Transp., Inc. v. Chicago & North Western Transp. Co.*, 62 F.3d at 189; *AM Int'l, Inc. v. Graphic Management Assocs., Inc.*, 44 F.3d at 574; *R.T. Hepworth Co. v. Dependable Insur. Co.*, 997 F.2d at 318. "When judges say that a contract is 'clear on its face,' they mean simply that an ordinary reader of English, reading the contract, would think its application to the dispute at hand certain." *AM Int'l, Inc. v. Graphic Management Assocs., Inc.*, 44 F.3d at 574. In that situation, the text of the contract gives no clue that it might mean something different than what it says. *Id.*

If the contract is clear on its face, the courts make a further distinction between subjective and objective evidence in deciding what evidence the proponent of ambiguity can offer to prove that the contract is, in fact, ambiguous. Subjective evidence of ambiguity refers to "the testimony of the parties themselves as to what they believe the contract means." *AM Int'l, Inc. v. Graphic Management Assocs., Inc.*, 44 F.3d at 575; *accord CSX Transp., Inc. v. Chicago & North Western Transp. Co.*, 62 F.3d at 189; *Home Insur. Co. v. Chicago & Northwestern Transp. Co.*, 56 F.3d at 768. This kind of evidence is invariably self-serving and difficult to verify, and with exceptions that are not relevant,[20] is inadmissible. *Pierce v.*

20. A party to a contract may offer subjective

evidence of ambiguity to demonstrate that the

Atchison, Topeka & Santa Fe Ry. Co., 65 F.3d at 567–68; CSX Transp., Inc. v. Chicago & North Western Transp. Co., 62 F.3d at 189; Home Insur. Co. v. Chicago & Northwestern Transp. Co., 56 F.3d at 768; AM Int'l, Inc. v. Graphic Management Assocs., Inc., 44 F.3d at 575; American Nat'l Bank & Trust Co. v. Northern Trust Co., 1995 WL 443917 at *3.

■■■■ Objective evidence, on the other hand, means evidence that can be supplied by disinterested third parties, and cannot be faked. Home Insur. Co. v. Chicago & Northwestern Transp. Co., 56 F.3d at 768; AM Int'l, Inc. v. Graphic Management Assocs., Inc., 44 F.3d at 575. Examples of objective evidence include custom and usage of the trade and the parties' prior course of dealing. Home Insur. Co. v. Chicago & Northwestern Transp. Co., 56 F.3d at 770; see R.T. Hepworth Co. v. Dependable Insur. Co., 997 F.2d at 318; American Nat'l Bank & Trust Co. v. Northern Trust Co., 1995 WL 443917 at *3. A party cannot, however, use extrinsic evidence to add terms to an agreement which is plausibly complete without them. R.T. Hepworth Co. v. Dependable Insur. Co., 997 F.2d at 318.

■■■ The determination of ambiguity is analogous to the search for factual issues on a motion for summary judgment. The court screens the evidence on a summary judgment motion to decide if there is a material factual issue to present to the jury. In a similar way, the court screens the objective evidence of ambiguity to determine if the agreement is ambiguous as a matter of law. If the court concludes that it is, only then will the parties be permitted to present evidence of their intentions to the jury. Home Insur. Co. v. Chicago & Northwestern Transp. Co., 56 F.3d at 768–69; AM Int'l, Inc. v. Graphic Management Assocs., Inc., 44 F.3d at 575.

■■ When these issues are raise by motion, as the parties do in this case, a court may conclude that the extrinsic evidence establishes an actual ambiguity, but that the evidence offered to prove the parties' intent is conflicting, or although undisputed, gives rise to more than one inference. See Coplay Cement Co. v. Willis & Paul Group, 983 F.2d 1435, 1439 (7th Cir.1993); FDIC v. Glynn, 1995 WL 571418 at *4. In that circumstance, the court cannot summarily decide what the parties intended, and must resolve the dispute only after conducting an evidentiary hearing. See FDIC v. Glynn, 1995 WL 571418 at *4.

### 3. Parol Evidence and the Keene Security Agreements

### a. The Error in the Definition of the Collateral.

■■ We have little trouble concluding that the inclusion of the definition of "Corporate Note" instead of "Treasury Note" creates an internal inconsistency that renders the definition intrinsically ambiguous. The error is evident from the face of the security agreement; the Collateral consists of Treasury notes, not corporate notes. Further, the definition of "Corporate Note" refers the reader to a specific Treasury note issue, identified by its unique maturity date. Finally, the security agreement lists the definitions in alphabetical order, and "Corporate Note" is out of order, placed between the definitions of "Treasury" and "Treasury Security." Under the circumstances, parol evidence is admissible to show that the use of the term "Corporate Note" is a mistake,[21] does not affect the substance of the agreement, and should be read as "Treasury Note".

The Bank has also proffered unrefuted evidence that explains the reason for the

---

parties' attached an idiosyncratic meaning to a term, or to prove fraud. Home Insur. Co. v. Chicago & Northwestern Transp. Co., 56 F.3d at 769; AM Int'l, Inc. v. Graphic Management Assocs., Inc., 44 F.3d at 576.

**21.** The parol evidence rule does not apply where a party seeks to reform a mistake in the contract. See Goodwine State Bank v. Mullins, 253 Ill.

App.3d 980, 991, 192 Ill.Dec. 901, 911, 625 N.E.2d 1056, 1066 (Ill.App.Ct.1993), leave to appeal denied, 155 Ill.2d 563, 198 Ill.Dec. 542, 633 N.E.2d 4 (1994); John D. Calamari & Joseph M. Perillo, The Law of Contracts, § 3–7, at 160–61 (3d ed. 1987).

mistake, and confirms that the parties intended to define and refer to Treasury securities. According to the affidavit of Ruth E. Gross, a vice-president of the Bank, sworn to February 8, 1995 ("Gross Affidavit"), Keene asked the Bank, in 1993, to consider permitting Keene to pledge corporate notes rather than Treasury notes as collateral for the letters of credit. (Gross Affidavit ¶ 12). In anticipation of the change, Keene redrafted the standard security agreement to alter the existing definition of "Treasury Note" to "Corporate Note." (*Id.* ¶ 14). The Bank considered Keene's request and declined it, preferring to collateralize Keene's reimbursement obligation with liquid, marketable Treasury notes. (*Id.* ¶¶ 12–13). Keene, however, never corrected the erroneous definition which remained undiscovered until the latter half of 1993. (*Id.* ¶¶ 15–16). The Bank's evidence resolves the intrinsic ambiguity caused by the exclusion of the wrong definition, and makes clear what the parties intended on this score.

### b. The Description of the Treasury Note

■ The second and more serious error concerns the identification of the encumbered portion of the particular Treasury note issue through use of the phrase "par value". We agree with the Committee that the description of the Collateral is unambiguous on its face. It describes a particular note in a specific denomination with a specific maturity date. The average person reading this agreement and unfamiliar with Treasury note multiples and book-entry securities would not suspect that it means anything other than what it says. The question is whether the Bank should be permitted to show that the security agreement is actually ambiguous and means what the Bank says it does. The Bank can do so only if Illinois' rejection of the "four corners" rule extends to security agreements.

■ At first blush, there seems no reason to distinguish between security agreements and other types of contracts in apply-

ing the "four corners" rule. Security agreements are contracts, and governed by the ordinary rules of contract interpretation. A security agreement is "effective according to its terms between the parties, against purchasers of the collateral and against creditors." *Provident Hosp. & Training Ass'n v. GMAC Mortgage Co.* (*In re Provident Hosp. & Training Ass'n* ), 79 B.R. 374, 377 (Bankr. N.D.Ill.1987) (quoting UCC § 9–201); *accord Schechter v. Nelson* (*In re Nightway Transp. Co.*), 96 B.R. 854, 858 (Bankr.N.D.Ill.1989). Accordingly, the determination of whether a creditor's security interest extends to certain property "is governed by the intent of the parties as expressed in the security agreement." *In re Nightway Transp. Co.*, 96 B.R. at 858; *accord City of Chicago v. Michigan Beach Hous. Co-op.*, 242 Ill.App.3d at 644, 182 Ill.Dec. at 349, 609 N.E.2d at 883.

■ Nevertheless, it is not so clear that Illinois' rejection of the "four corners" rule carries over to security agreements. Security agreements, unlike most other contracts, affect the rights of third parties. Creditors and purchasers are not privy to the agreement, and generally lack the opportunity or the reason to inquire into the intention of the parties when the security agreement seems clear on its face. Further, *In re Martin Grinding & Machine Works, Inc.*, 793 F.2d 592 (7th Cir.1986), suggests that Illinois law does not permit consideration of any parol evidence if the collateral description is facially unambiguous.

In *Martin Grinding*, the debtor obtained two loans from a bank, and signed a security agreement which granted a security interest in machinery, equipment, furniture and fixtures. The parties had intended that the debtor also grant a security interest in inventory and accounts receivable. The parties other, related loan documents referred to the inventory and accounts receivable, and the financing statement listed the two items as collateral. However, the parties inadvertently failed to include these two additional categories of collateral in the security agreement.

Following the debtor's commencement of a chapter 11 case, the secured party asserted a

security interest in the inventory and accounts receivable. The bankruptcy court held that the security interest did not extend to the inventory and accounts receivable, *Forest Park Nat'l Bank v. Martin Grinding & Machine Works, Inc. (In re Martin Grinding & Machine Works, Inc.)*, 42 B.R. 888, 892 (Bankr.N.D.Ill.1984), and the district court affirmed in an unpublished opinion.

The Seventh Circuit affirmed the district court. It held that if a security agreement is unambiguous on its face, a court cannot consider the loan documents, the financing statement or other parol evidence to expand the security interest beyond that stated in the security agreement. *Martin Grinding*, 793 F.2d at 595. The Court recognized that the refusal to admit parol evidence might contravene the parties' intentions where, as in the case before it, they inadvertently omit certain agreed upon collateral from the security agreement. *Id.* at 596. Nevertheless, the Court concluded that a subsequent creditor must be able to rely on the face of the security agreement to determine what property is encumbered. *Id.* at 597.

Trying to reconcile *Martin Grinding* with the recent trend of Seventh Circuit law is no easy task. The recent cases neither deal with ambiguous security agreements nor cite or discuss *Martin Grinding*. Yet, cases subsequent to *Martin Grinding* which involve security agreements follow an approach consistent with the current trend. In *Hunter v. United States (In re Hunter)*, 68 B.R. 366 (Bankr.C.D.Ill.1986), the debtor signed a security agreement containing a "dragnet" clause that secured all existing and future indebtedness. The debtor subsequently executed a second note secured by a mortgage on real property. The second set of loan documents did not refer to the prior security agreement or the "dragnet" clause.

The issue before the *Hunter* court concerned whether the "dragnet" clause secured

the later debt. The court did not cite *Martin Grinding*, but instead, relied upon *Sunstream Jet Express v. International Air Service Co.*, 734 F.2d 1258 (7th Cir.1984), and ruled that although the "dragnet" clause was clear and unambiguous on its face, an ambiguity existed between the first and the second sets of loan documents, and parol evidence was admissible to determine the intent of the parties. *Hunter*, 68 B.R. at 367–68.[22] Thus, the court relied upon extrinsic evidence to determine that a facially unambiguous agreement was actually ambiguous.

*Harris Trust & Savs. Bank v. Wayne J. Klein Corp. (In re Klein)*, 97 B.R. 394 (N.D.Ill.1989) also involved the interpretation of a "dragnet" clause, and like the *Hunter* court, did not cite to *Martin Grinding*. The *Klein* court nevertheless reviewed the apparent split in the Illinois cases, which the Seventh Circuit has since reconciled, and concluded that the conflict in the cases was more apparent than real. The district court stated that "Illinois courts have always allowed extrinsic evidence to be introduced to show that an apparently unambiguous contract is nevertheless ambiguous." *Id.* at 397 (citing *Sunstream*, 734 F.2d at 1267–68). The "contrary" authority, exemplified by *Rakowski v. Lucente*, 104 Ill.2d 317, 84 Ill.Dec. 654, 472 N.E.2d 791 (1984), merely holds that where the contract is unambiguous, the contract rather than the intentions of the parties controls. *In re Klein*, 97 B.R. at 397. But the court can, in the first instance, receive extrinsic evidence to determine if an agreement is ambiguous or unambiguous. *Id.*

*Klein* presaged the Seventh Circuit's recent reconciliation of Illinois case law, and suggests that the general rules relating to the use of parol evidence apply to security agreements. In any event, we find *Martin Grinding* to be distinguishable to the case before the Court. In *Martin Grinding*, the Court encountered a secured party's attempt

---

22. This appears to be directly contrary to *Martin Grinding*. The latter dealt, however, with offering parol evidence to *expand* the scope of the collateral while *Hunter* involved using parol evidence to *limit* the collateral. Limiting collateral does not trigger the concerns about third party reliance which the *Martin Grinding* court identified as the rationale underlying the stricter application of the parol evidence rule.

to expand an otherwise unambiguous security agreement to include specific and identifiable categories of collateral that it did not mention. In support of the principle that parol evidence cannot be admitted to expand a security interest under an unambiguous security agreement, the *Martin Grinding* court cited three cases with analogous fact patterns. *See In re California Pump & Mfg. Co.*, 588 F.2d 717, 719 (9th Cir.1978) (security agreement that identified collateral located only at a specific place cannot be expanded to include all of the debtor's property wherever located); *H & I Pipe & Supply Co. v. First Nat'l Bank (In re H & I Pipe & Supply Co.)*, 44 B.R. 949, 950 (Bankr.M.D.Tenn.1984) (secured party could not use parol evidence to expand collateral to include inventory and accounts receivable which were not mentioned); *American State Bank v. Swearingen (In re Swearingen)*, 27 B.R. 379, 383 (Bankr.D.Kan.1983) (secured party cannot offer parol evidence to show that parties intended to include but inadvertently omitted a mobile home from description of collateral in their security agreement).

 In the matter before the Court, the Bank does not seek to show that the security agreement omits an item or category of collateral that the parties intended to include. Instead, the Bank and the Committee argue over the sufficiency of the description of the Bank's interest in the particular Treasury note. The Bank contends that the security agreement grants a lien in a specified issue up to a certain dollar value, and the Committee contends that it must be read as a pledge of a specific and non-existent Treasury note within that issue. In either case, the Collateral consists of some interest in a Treasury security that is identified in the security agreement. While a third party may not be able to determine the extent of that interest, a review of each security agreement will indicate to a third party that the subject issue—the "security" that the agreement describes—is encumbered in some manner. Consequently, we conclude that the parties

to this dispute may offer objective evidence relating to the existence of an extrinsic ambiguity.

 Although much of the Bank's proof is subjective, stating what the Bank intended,[23] enough objective proof exists to satisfy us that the description of the Collateral is ambiguous as a matter of law. The Fed issues book-entry Treasury notes in multiples (or "par values") of $1,000.00, and it does not appear that anyone can transfer or hold them in different multiples. Consequently, anyone knowledgeable in Government securities would suspect that the descriptions do not refer to a specific Treasury security in a different denomination. Moreover, we do not lightly presume that sophisticated parties like the Bank and Keene would intend to create a security interest in something that does not exist, and this may indicate that the parties attached an idiosyncratic meaning to the terms they chose.

Further, the parties' course of dealing shows that the Collateral description reflects a dollar value rather than a particular security. The Bank had been providing Keene with fully collateralized letters of credit since prior to 1990. (Gross Affidavit ¶ 2). At the inception of their relationship, Keene would pledge all of the Treasury notes in a given issue to secure the repayment of Keene's reimbursement obligation under a letter of credit, regardless of the size of that obligation. (*Id.* ¶ 24). In 1993, the parties changed this practice; rather than pledge an entire series to secure a reimbursement obligation, Keene pledged only that amount of any series with a "par value" equal to 105% of the reimbursement obligation. (*Id.* ¶ 25). As a result of the change, the total pledges of a specific issue of Treasury notes would be contained in separate security agreements under which Keene pledged portions of a particular issue. (*Id.* ¶ 26). Comparison between the "par value" in a security agreement and the face amount of the corresponding letter of credit confirms that the "par value" equals 105% of the letter of credit.

---

23. For example, the Gross Affidavit, ¶ 27 avers: "It was the Bank's intent to take as a security a specific dollar amount of a specific Treasury issue."

The Court concludes on the basis of this evidence that the Collateral description in the security agreement could not possibly mean what it seems to mean. Hence, it is ambiguous as a matter of law. Having reached this point, we cannot go farther and determine what Keene and the Bank intended when they described the Collateral as they did. We discuss our reasons in the following section.

### c. The "Underfocused" Description of the Collateral

While the granting clause and Definitions point to a specific Treasury issue, they do not identify which specific portion, if any, the parties intended to be the Collateral. In an earlier edition of their hornbook, Professors White and Summers termed this an "underfocused" description:

> When a description fails to give enough information to distinguish the intended collateral from other items of the same kind, it is underfocused. Such descriptions invariably leave the secured party without a clear claim. Thus, when a cattle rancher with 800 head of holsteins, grants his creditor a security interest in "46 cattle," the description is, at least arguably, underfocused. If the parties intend that *any* 46 of the cattle in a determinate herd be subject to the security interest, the description is adequate. But what if the creditor intends to take an interest in 46 specific cattle—for example, all the cattle sold by him to the buyer debtor? The security agreement merely identifies the collateral as "46 cattle." What now? The agreement is not unduly vague; the parties intend to give the seller an interest in 46 specific cows. Only the adequacy of the description is in issue. Here, we follow the cue of *United States v. Mid–State Sales* [336 F.Supp. 1099 (D.Neb.1971)]. In that case, District Judge Urbom concluded that such a description was adequate to satisfy the objective requirements of 9–203 and 9–110, but that it was "sufficiently uncertain, where other ... cattle are owned by the debtor, to cast a substantial burden upon the [se-cured creditor] to be able clearly to identify collateral in order to obtain a priority over another holder of security interest."

James J. White & Robert S. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 23–3, at 911 (2d ed. 1980).

As Professors White and Summers stated and the *Mid–States Sales* court held, the creditor with a security interest in a carved out portion of like property bears a substantial burden of segregating its collateral from the balance of the debtor's property. Where the lienor is unable to do so, its security interest must fall. *See, e.g., Piggott State Bank v. Pollard Gin Co.*, 243 Ark. 159, 160–61, 419 S.W.2d 120, 121 (1967) (security agreement identifying collateral as seven acres of cotton to be grown by the debtor on another's land in 1965 failed to identify whether the debtor grew exactly seven acres of cotton on the land in 1965 and whether anyone else grew cotton on the land); *Milhender Distributing Co. v. Fairway Wholesale, Inc. (In re Fairway Wholesale, Inc.)*, 21 U.C.C.R.S. 1429, 1435, 1977 WL 25593 (Bankr.D.Conn.1977) (security agreement that grants lien on all property delivered by the secured party to the debtor fails to distinguish and separate the collateral from all the other, similar property that the debtor held).

In order to determine if the security agreement adequately describes the nature of the Bank's interest, it is first necessary to discover the precise interest that the parties intended to convey. It is true that the Treasury securities are fungible, held in bulk, and lack the physical attributes of actual certificates. In enforcing its lien or simply liquidating an issue for Keene, the Bank could have sold any portion of the corresponding notes in its account with the Fed. This suggests that the parties may not have intended to designate or "carve out" a specific portion of the issue to pledge.

On the other hand, the fungible nature of the Collateral does not prevent the

parties from doing so. For this reason, we reject the Bank's argument that because book-entry Treasury securities are fungible, further identification is neither possible nor necessary nor intended. A party that holds securities in bulk for another can identify specific collateral by allocating it or physically segregating it. *See In re Paragon Securities Co.,* 599 F.2d 551, 557 (3d Cir.1979) (insolvent stockbroker's failure to allocate or set aside any portion of fungible bulk of securities prevented customer from identifying them); *In re Bevill, Bresler & Schulman Asset Management Corp.,* 67 B.R. at 609 (government securities dealer identified owners of book-entry securities in its books and records by issuer, the issue, cusip number, coupon rate, maturity date and face amount); *Wichita Fed. Sav. & Loan v. Comark,* 610 F.Supp. at 416–18 (discussing principles of "identification" under former UCC § 8–313(1)(c)); *Matthysse v. Securities Processing Services, Inc.,* 444 F.Supp. 1009, 1018 (S.D.N.Y.1977) (insolvent stockbroker identified certificated securities by specifically allocating them to a customer and recording explicit identifying information on its books and records). Further, if the Bank held an entire position in a particular issue for Keene and no other customer, the entire bulk would arguably be identified as belonging to Keene. Katzman at 169.

The Fed creates the fiction that Book-entry Treasury securities exist in certificated form, and that financial intermediaries hold specific securities. The Bank allocated certain book-entry Treasury securities to Keene on its books and records, and the periodic statements pertaining to the STAM Account provide identification similar to what was deemed sufficient in *In re Bevill, Bresler & Schulman Asset Management Corp.* Accordingly, the evidence suggests that the parties perpetuated the Fed's fiction; they treated Keene as owning specific Treasury note issues rather than contract rights, and could have intended that Keene's pledge attach to a specific portion of the issue.

Further, in certain circumstances, it might be necessary to identify the encumbered portion of the issue. For example, each security agreement grants the Bank a security interest in the defined Treasury security, and in all substituted cash and other Treasury securities purchased with its proceeds. Prior to but not later than the maturity date, Keene would sell a particular issue and replace the old Collateral with new Collateral purchased with the proceeds.

The STAM Account statement shows that the face value of any issue always exceeded the aggregate Bank lien against that issue. Further, the market value of the issue could exceed the "par value", and hence, the proceeds of the sale of any issue could exceed the amount that Keene had pledged. Yet if the Bank's lien follows the cash proceeds and substitutes, one cannot tell if Keene's apparent equity in any issue actually constitutes the substituted Collateral derived from the sale of a predecessor issue.

We mention these possibilities but leave their resolution for another day. Their materiality turns on the nature of the Bank's interest under the security agreements, and the parties in this dispute must provide evidence of the contract parties' intention. If that evidence does not reveal the intentions, the outcome of the dispute may depend on doctrines of construction like *contra proferentum,* and we would need to consider evidence of which party drafted the ambiguous description of the Collateral.

### CONCLUSION

For the reasons stated, we deny the Bank's motion for relief from the automatic stay. The Committee and the Bank are directed to contact chambers to arrange a conference at which the parties and the Court can confer regarding the course of this contested matter, and whether one or the other should file an adversary proceeding in which the Committee can assert its other grounds, including preferential transfers, for invalidating all or any portion of the Bank's claimed security interests.

IT IS SO ORDERED.